**Benjamin A. STRATMORE and Helen Stratmore, Plaintiffs,**

v.

**UNITED STATES of America, Defendant-Appellant.**

No. 17786.

United States Court of Appeals Third Circuit.

Argued Sept. 30, 1969.

Decided Jan. 6, 1970.

Rehearing Denied Jan. 29, 1970.

Stahl, Circuit Judge, dissented.

Stanley L. Ruby, Dept. of Justice, Tax Division, Washington, D. C. (Johnnie M. Walters, Asst. Atty. Gen., Lee A. Jackson, William A. Friedlander, Attys., Dept. of Justice, Washington, D.C., Donald Horowitz, U. S. Atty., on the brief), for appellant.

Kenneth T. Statmore, Wayne, N. J., for appellee.

Before STALEY, SEITZ and STAHL, Circuit Judges.

OPINION OF THE COURT

SEITZ, Circuit Judge.

Plaintiffs, taxpayers, brought an action in the district court for a refund of income taxes for the year 1959, contending that $17,088.00 they paid as guarantors of the promissory notes of corporations of which they were officers and stockholders was fully deductible either as a loss incurred in a transaction entered into for profit though not connected with a trade or business under section 165(c) (2) of the Internal Revenue Code of 1954, or, alternatively, a bad debt incurred in a trade or business, under section 166(a) and (d). The district court ruled against the taxpayers on the former contention but in favor of them on the latter. Stratmore v. United States, 292 F.Supp. 59 (D.N.J.1968). The Government appeals.

The case was decided by the district court on a stipulation of facts, which discloses the following. In 1959 and prior thereto the taxpayers, husband and wife, were officers and stockholders of B. B. Rider Corporation (Rider) and General Manufacturing Corporation (General), both functioning business enterprises. They acquired an interest in Rider in 1938 and were instrumental in forming General in 1950. Taxpayer, Benjamin A. Stratmore, was and still is president of both corporations. His primary duties during the past fifteen years have been to secure financing so that the corporations could meet their operational needs.

General commenced operations with a capitalization of $50,000.00, which it borrowed from Rider. Rider in turn had to borrow the money from certain individuals who would not lend the money directly to General because, at the time, General was without assets. When General's need for capital increased, Benjamin A. Stratmore had to seek additional financing for it.

After exhausting credit with banking institutions, Stratmore was compelled to borrow money for Rider and General from certain individuals. In the typical transaction, these individuals would lend money to one of the corporations but would require the taxpayers to personally guarantee the corporate promissory notes by endorsing them. Without these endorsements the loans could not have been obtained and the corporations would have ceased functioning.

Although the aggregate amount of such loans is not set forth in the stipulation, it is clear that very substantial sums were involved. Furthermore, it was stipulated that taxpayers gave their endorsements and lent their credit to the corporations "with the expectation that said corporations' use of these funds would provide them with increased receipts by way of salary and inhance [sic] the value of their proprietary interests in said corporations."

The taxpayers' endorsements were executed prior to August 1957, when Rider and General filed voluntary petitions in bankruptcy seeking reorganization under Chapter XI of the Bankruptcy Act. At the creditors' insistence, taxpayers did not file any claims. A plan of payment was approved whereby 25 per cent of the obligations owing creditors would be paid. The corporations were discharged from bankruptcy in December 1958, and thereafter, certain of the creditors demanded payment of the balance of the corporate debts from taxpayers as guarantors of the corporate notes. Taxpayers agreed to pay part of the debt owed these creditors in full settlement of their obligations as guarantors. We are concerned with the payment made by them in 1959.

On their original tax return for 1959, taxpayers treated the 1959 payment as a non-business bad debt, deductible only as a short-term capital loss. They later filed an amended return claiming that payment was entirely deductible under section 165(c) (2) of the Internal Revenue Code of 1954. In the district court, taxpayers contended that the amount they paid as guarantors of the corporate notes was either (1) a loss in a transaction entered into for profit though not connected with a trade or business, under section 165(c) (2), or (2) a bad debt incurred in a trade or business, under section 166(a) and (d).

■ We consider first the district court's ruling that the payment constituted a fully deductible business bad debt. Section 166(a) and (d) provide, insofar as here pertinent, that an individual taxpayer can deduct a bad debt in full only if it is created or acquired in connection with, or if the loss therefrom is incurred in, the taxpayer's trade or business. The test applied in resolving the issue of whether a loss is incurred in a trade or business is found in Treasury Regulation § 1.166–5(b) (2):

"For purposes of subparagraph (2) of this paragraph, the character of the

debt is to be determined by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt comes within the exception [fully deductible] provided by that subparagraph."

See also Whipple v. Commissioner, 373 U.S. 193, 201, 83 S.Ct. 1168, 10 L.Ed.2d 288 (1963).

The Government is willing to assume for purposes of this appeal that the 1959 payment by these taxpayers pursuant to their guarantees gave rise to a bad debt.[1] However, it contends that, contrary to the ruling of the district court and the contention of the taxpayers, the payment was not deductible as a business bad debt because the taxpayers failed to meet their burden of showing facts from which it could be found that the loss was proximately related to their positions as salaried corporate officers, rather than to their interests as investors in the corporation.

The Government does not challenge the proposition that one acting as a salaried corporate executive can be considered to be engaged in a trade or business for purposes of the statute. This then leaves for decision the extremely difficult practical problem as to whether the taxpayers demonstrated factually that their loss as guarantors was proximately related to their business of being corporate officials, or, more concretely, to the retention and enlargement of their salaries.

The Government contends that for a bad debt to be proximately related to the separate trade or business of a stockholder-employee, it is necessary to show

that his interest as an employee was the primary motivation[2] for guaranteeing the corporate notes. The taxpayers, relying on Weddle v. Commissioner, 325 F.2d 849, 851 (2d Cir. 1963), argue that it only need be a "significant motivation." The district court did not explicitly state what test it was applying. The Government further contends that, in any event, the facts here meet neither test.

We agree with the Government that the taxpayers have not met their burden of showing even a significant motivation. Because of this view we take of the record, we find it unnecessary to decide whether the correct test is one of primary motivation or of significant motivation.

The heart of the district court's factual evaluation is found in the following portion of its opinion:

"Rider and General would have ceased to function but for the loans obtained for said corporations by plaintiffs. And those loans would not have been made without plaintiffs' guaranty. A cessation of business by the corporations would have resulted in a loss of plaintiffs' salaried positions. It has been stipulated that plaintiffs gave their indorsements and lent their credit to Rider and General with the expectation that the use of the borrowed and guaranteed loans by the corporations would provide plaintiffs 'with increased receipts by way of salary and enhance the value of their proprietary interests in said corporations.' Such motivation is sufficient under the cited cases." 292 F.Supp. at 62–63.

The stipulation clearly shows that a partial motivation for taxpayers' endorsement of the corporate notes was to protect and enhance their proprietary inter-

1. The Government urged in the alternative in the district court that the payment should be treated as a contribution to capital, not a bad debt. The Government states in its brief that it is presently reviewing this position and has determined not to advance it until that re-

view has been completed. For that reason, the Government informs us, it is not raising the contribution to capital issue on this appeal.

2. Niblock v. Commissioner, 417 F.2d 1185 (7th Cir. 1969).

ests, which, of course, is not a basis for treating a loss resulting therefrom as a business bad debt. Certainly, where both proprietary and employee motivation are admittedly present, the extent of the proprietary motivation is most relevant in determining whether there was a "significant" employee motivation. Yet, the district court made no finding as to the extent of this proprietary motivation; indeed, on the sparse record, there could be none. For example, there is not even a showing in the record of the extent of taxpayers' stock interests and capital contributions. But even if the district court were free to consider whether there was a significant employee motivation without considering the extent of the proprietary motivation, taxpayers would still have failed to present sufficient facts to carry their burden. The district court appears to have relied heavily on the stipulation that, without the loans guaranteed by taxpayers, taxpayers' salaries, along with the corporations, would have ceased to exist. But since taxpayers did not even provide evidence as to the amounts of their salaries, it was not possible for the district court to evaluate how important the factors of salary maintenance and increase were in their willingness to guarantee the loans.

True it is that the district court inferred from the stipulated facts that a sufficient motivation was present to fulfill the statutory requirement. But the difficulty with its approach, apart from the fact it did not articulate which standard of motivation it was applying, is that while the facts justify an inference that in endorsing the notes the taxpayers were motivated to some extent by a desire to protect and enhance their salaried positions, the facts do not warrant a finding that such action was significantly motivated by the employee factor.

We conclude that the 1959 payment by taxpayers was not a fully deductible business bad debt under section 166(a) and (d).

Taxpayers argue in the alternative that the guarantees constituted transactions entered into for profit within the meaning of section 165(c) (2) of the Internal Revenue Code of 1954, and that the payments pursuant to these guarantees resulted in losses rather than bad debts.

In Putnam v. Commissioner, 352 U.S. 82, 77 S.Ct. 175, 1 L.Ed.2d 144 (1956), the Supreme Court held that the loss sustained by a guarantor unable to recover from the debtor is by its very nature a loss from a bad debt to which the guarantor becomes subrogated upon discharging his liability as guarantor. The Court went on to decide that such a loss must be regarded as a bad debt loss, deductible as such or not at all.

The taxpayers would distinguish Putnam v. Commissioner. They assert that under New Jersey law a guarantor cannot be subrogated to the rights of a creditor until the claim of the creditor against the debtor has been paid in full. They argue that since they settled their liability on the guarantees for less than the full amount due, they never became subrogated to the rights of the creditors. Because, say taxpayers, they were not subrogated to the creditors' rights, there was no "debt" which could "become worthless" in their hands. Therefore, they argue, their loss must fall under section 165(c) (2) as a transaction entered into for profit, though not connected with a trade or business, since it cannot be a bad debt under section 166.

The Government does not challenge taxpayers' contention that as a matter of state law there was no subrogation here because taxpayers settled with the creditors and paid less than the full amount due on the guarantees. Rather, it contends that bad debts within section 166 include not only debts created by direct loans, but by an indirect endorsement or other type of arrangement which creates secondary or primary liability on the part of a corporate stock-

holder, whether or not the stockholder has under state law the right of subrogation following payment.

We are by no means certain that taxpayers' state law position is sound where, as here, the creditors' claims against the debtor had been totally extinguished by the approval of the Plan of Reorganization prior to the taxpayers' payment to the creditors. But we think that the essence of *Putnam* is the view of the Court of the Congressional purpose behind section 166(c) and the part it was intended to play in the statutory scheme for a common tax treatment of all losses suffered by a corporate stockholder in providing his corporation with financing: these losses are to be treated as capital losses. As the Court pointed out in *Putnam*, "There is no real or economic difference between the loss of an investment made in the form of a direct loan to a corporation and one made indirectly in the form of a guaranteed bank loan. The tax consequences should in all reason be the same * * *." 352 U.S. at 92–93, 77 S.Ct. at 180.

It is not meaningful to emphasize unduly the common law principle of subrogation in analyzing the substantial realities upon which federal taxation is based. When the creditor turns to the guarantor for payment, the debt is already uncollectible. In both *Putnam*

and the present case the claims against the debtors were at all relevant times no more collectible in the hands of the guarantors than in those of the original lender. To allow the tax result to turn on the presence or absence of this technical right of subrogation under state law would be to undermine the *Putnam* doctrine—taxpayers could change capital losses to ordinary losses almost at will. For example, every guarantor could obtain an ordinary loss simply by reaching an agreement with the creditor for payment of less than the full amount of the guarantor's liability, and thus avoiding any subrogation. We hold that taxpayers' payment pursuant to the guarantees was not a loss under section 165(c) (2) but rather a non-business bad debt under section 166(d).

The judgment of the district court will be reversed.

STAHL, Circuit Judge (dissenting).

While I agree with the majority that the decision of the district court should not be affirmed, I must dissent from the outright holding that the taxpayers are not entitled to a business bad debt deduction under § 166 of the Internal Revenue Code.[1] As discussed later, I believe appellees should be afforded an opportunity to be relieved of a stipulation clearly insufficient and improvident.

According to the Treasury Regulations,[2] a full deduction based on a

---

1. I am in accord with the alternate holding of the majority that the amounts appellees were compelled to pay in satisfaction of their guarantees are not deductible under § 165 as a loss incurred in a transaction entered into for profit.

2. The Regulations provide, in pertinent part, as follows:
    The question whether a debt is a nonbusiness debt is a question of fact in each particular case. The determination of whether the loss on a debt's becoming worthless has been incurred in a trade or business of the taxpayer shall, for this purpose, be made in substantially the same manner for determining whether a loss has been incurred in a trade or business for purposes of section 165(c) (1). For purposes

of subparagraph (2) of this paragraph, the character of the debt is to be determined by the relation which the loss resulting from the debt's becoming worthless bears to the trade or business of the taxpayer. If that relation is a proximate one in the conduct of the trade or business in which the taxpayer is engaged at the time the debt becomes worthless, the debt comes within the exception provided by that subparagraph. * * * 26 C.F.R. § 1.166–5(b).
    The applicable statutory provision of the Internal Revenue Code does not itself establish the "proximate relation" test but rather refers to debts created "in connection with" and losses "incurred in" the taxpayer's business. See note 4 *infra*.

loss from a bad debt is proper only where the loss is *proximately* related to a trade or business of the taxpayer. Therefore, where a bad debt loss is suffered by an individual in the course of his economic activity, two key issues arise in determining deductibility:

(1) Was the taxpayer engaged in a trade or business at the time of the loss; and

(2) Was the specific activity which gave rise to the bad debt loss part of the trade or business?

The resolution of each issue may depend to some extent on the taxpayer's motivation, but care should be taken not to confuse the two.[3] The question of proximate relationship arises only in connection with the latter. As pointed out in the majority opinion, it is not contested here that the taxpayers' activities as paid officers of the corporations in which they held stock amounted to a trade or business. The only issue, therefore, is whether their guarantees of loans to the corporations were part of or were proximately related to that business.

As indicated in the majority opinion, this case was decided below on a stipulation of fact which established that appellee-taxpayers acted both to enhance their investment and to preserve their salaries in their employment as corporate officers. The district court concluded that since the stipulation showed that trade or business considerations did enter into the decision of the taxpayers to guarantee the loans, there was a sufficient relationship between the subsequent loss and the taxpayers' trade or business to warrant the bad debt deduction.

The Government has argued here that the district court's conclusion was erroneous on either of two grounds.

### Primary Motivation

First the Government asserts that where an obligation resulting in a bad debt loss is entered into pursuant to both business and investment considerations, a taxpayer is not entitled to a business bad debt deduction under § 166[4] unless he proves that the business motivation was in fact primary. It argues that since the stipulation on

---

3. In Imbesi v. Commissioner of Internal Revenue, 361 F.2d 640 (3d Cir. 1966), a case involving the deductibility of a loss under § 165(c) (1), referred to in the Regulations set forth in note 2 *supra*, this court said:

[T]he primary intent or motive of the taxpayer has always been the ultimate test for determining whether losses are deductible because incurred in a trade or business or in transactions for profit, or on the other hand are not deductible because they are personal expenses. 361 F.2d at 644.

However, the *Imbesi* case and the quoted language dealt only with the first of the issues mentioned in the text, *i. e.*, whether the activities of the taxpayer in dispute, the breeding, training and exhibition of dogs and the breeding, training and racing of horses, constituted a trade or business or a personal hobby. In the instant appeal, it is conceded that appellees were engaged in a trade or business. At issue is whether the guaranteeing of the notes was sufficiently related to their trade or business to permit the deduction.

4. The relevant parts of § 166 provide as follows:

Sec. 166. Bad Debts.

(a) General rule—

(1) Wholly worthless debts—There shall be allowed as a deduction any debt which becomes worthless within the taxable year.

\*     \*     \*     \*     \*

(d) Nonbusiness debts—

(1) General Rule—In the case of a taxpayer other than a corporation—

(A) [subsection (a)] shall not apply to any nonbusiness debt;

\*     \*     \*     \*     \*

(2) Nonbusiness debt defined—For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than—

(A) a debt created or acquired (as the case may be) *in connection with a* trade or business of the taxpayer; or

(B) a debt the loss from the worthlessness of which is *incurred in* the taxpayer's trade or business. (Emphasis added.) 26 U.S.C. § 166.

which the case was tried shows only that the two motivations, i. e., the preservation of employment and enhancement of investment, were present in unspecified degrees, the taxpayers have not met their burden and have not proved that they were entitled to the full deductibility of their loss under § 166.

I would reject this argument as I do not believe that the language of either the statute or the regulations, which collectively refer to debts "in connection with," "incurred in" and in "proximate" relation to the taxpayers' business, can fairly be said to require that the taxpayers show a primary or dominant business or employment motivation.[5] The import of the language is that both business or employment *and* investment motivations may be present in a transaction without the one negating the connection of the transaction with the other, and consequently that the taxpayer need show only a *significant* rather than a *primary* business motivation in order to deduct a business bad debt.[6]

Language used by the Supreme Court in the leading case in this area, Whipple v. Commissioner of Internal Revenue, 373 U. S. 193, 83 S.Ct. 1168, 10 L.Ed.2d 288 (1963), supports this view. Upon examination of the legislative history of the bad debt provision of the Code, the Court concluded that the predecessor to § 166 "was designed to make full deductibility of a bad debt turn upon its proximate connection with activities which the tax laws recognized as a trade or business * * *." 373 U.S. at 201, 83 S.Ct. at 1173. Without discussing whether such a proximate connection existed in that case, the Court there held that the taxpayer was not entitled to a business bad debt deduction for losses on loans made to a soft drink corporation which he had promoted because his activity did not amount to a trade or business.

Here, of course, the only question is whether there was a "proximate connection" between the appellee-taxpayers' guarantees and their acknowledged trade or business as officers of the corporations to which the loans were made. Speaking of situations in which a taxpayer is engaged in a trade or business unlike the case before it, the Supreme Court went on to say in *Whipple* that where "the taxpayer demonstrates an independent trade or business of his own, care must be taken to distinguish bad debt losses arising from his own business and those actually arising from *activities peculiar to an investor* concerned with, and participating in, the conduct of the corporate business." 373 U. S. at 202, 83 S.Ct. at 1174. (Emphasis added.)

---

5. *See* Weddle v. Commissioner, 325 F.2d 849, 851 (2d Cir. 1963), discussed *infra* at note 9 and the text thereto.

6. In Note, Shareholder-Creditor Bad Debts Under Section 166 of the Internal Revenue Code, 75 Harv.L.Rev. 589, 601 (1962), it is stated:

> It would certainly seem that loans should be considered sufficiently proximate when necessary to assure the continued operation of the corporation. The loan is no less a condition of the taxpayer's continuing in his business of rendering services when voluntarily made to keep the corporation by which he is employed from shutting down than when made to avoid being fired by the corporation's management [footnote omitted; see Trent v. Commissioner, 291 F.2d 669 (2d Cir. 1961)]. While the question of proximate relationship in such cases might be resolved by seeking to determine whether the taxpayer's primary motivation in making the loan is to maintain his personal business or to protect his investment * * *, any effort to distinguish such motives seems fruitless when the shareholder's personal business is so inextricably intertwined with his investment in the corporation. Inevitably the taxpayer will desire to protect both his investment and his employment without making any distinction between the two; and neither the Code nor the Regulations precludes a determination that the existence of a motive to maintain personal employment is sufficient to justify "business" debt treatment, even though other motives are also present. * * *

Thus, it would seem that a taxpayer having both business and investment motivations should be entitled to a business bad debt deduction for losses arising out of transactions which are not "peculiar to" or closely identified with investment. This standard is undoubtedly met where the taxpayer shows that the transaction generating the loss was significantly motivated by business considerations. In no way does it appear that in such a situation the statute and the regulations require that the establishment of a proximate connection should depend on a showing that the transaction leading to the loss was *primarily* motivated by the trade or business.

Our attention has been called to only one case in which a court of appeals has held squarely that § 166 demands the application of the primary motivation test. Niblock v. Commissioner of Internal Revenue, 417 F.2d 1185 (7th Cir. 1969).[7] Even in this case the court does not seem to have directly applied the rule which it articulated. After examining the evidence, the court concluded that the loss had *no* relationship to the taxpayer's employment and, in fact, resulted from guarantees "made to build up the value of the stock of the corporation." 417 F.2d at 1187. The approach in *Niblock* was in effect quite similar to that of the many cases where corporate officer-stockholders have argued that bad debt losses were suffered in the course of their trade or business.

In cases under § 166, the courts have usually examined the evidence in support of a proximate connection with a trade or business, without indicating whether the primary or the significant motivation standard was applicable.[8] On the other hand, one court of appeals has expressly rejected the primary motivation test and has held that a taxpayer is entitled to a business bad debt deduction if he was at least significantly motivated by trade or business interests in entering into the transaction leading to the loss. Weddle v. Commissioner of Internal Revenue, 325 F.2d 849 (2d Cir. 1963).[9] This is the test I would follow.

7. The court said in *Niblock*:

In order for taxpayer to obtain a deduction for a business bad debt, he must prove that his corporate employment furnished the dominant and primary motivation for making the advances and the guarantees. We disagree with the significant motivating factor test that was applied by the majority in * * * [*Weddle*]. We believe that the only test that will *inject sufficient certainty* into the interpretation of Section 166, *supra*, is the dominant and primary motivation test that we have stated. 417 F.2d 1187. (Emphasis added.)

While certainty is to be devoutly sought in the interpretation of the tax laws, we should not sacrifice fairness to the taxpayer in order to achieve certainty. The significant motivation test, while more flexible, preesnts no insurmountable difficulties in application. More importantly, nothing in the statute or the regulations appears to compel adoption of the primary motivation rule.

8. See, *e. g.*, Spillers v. Commissioner of Internal Revenue, 407 F.2d 530, 534 (5th Cir. 1969); United States v. Wor-

rell, 398 F.2d 427 (5th Cir. 1968); Lundgren v. Commissioner of Internal Revenue, 376 F.2d 623 (9th Cir. 1967) (by its citation of Weddle v. Commissioner of Internal Revenue, note 9 *infra* and text thereto, the court may have been indicating approval of the significant motivation rule); Kelly v. Patterson, 331 F.2d 753 (5th Cir. 1964). See generally Annot., Federal Income Tax: Stockholder's loan to corporation as basis for business bad debt deduction, 25 A.L.R.2d 633 (1952).

9. *Weddle* was decided after the Supreme Court's treatment of § 166 in Whipple v. Commissioner of Internal Revenue, *supra*.

In the opinion below, Judge Augelli described *Weddle* as expressing the "view that the necessary proximate relation might be established even where the primary motivating cause for the loan having been made was from the standpoint of a stockholder-investor, if there was a significant secondary motivation related to the trade or business of being an employee." 292 F.Supp. at 63.

See also Millsap v. Commissioner of Internal Revenue, 387 F.2d 420 (8th Cir.

*Sufficiency of Evidence to Support Significant Motivation Test*

The Government's second argument is that there was insufficient evidence for the court below to sustain the allowance of a deduction even under the significant motivation approach. While the majority does not decide whether the primary or significant motivation standard is to be applied, it concludes that the Government's argument that the proof meets neither standard is meritorious. To this extent I am in agreement with the majority but, in my view, this does not end the matter.

The stipulation before the district court was insufficient to establish a proximate connection between the bad debt loss and the taxpayers' business as corporate officers because it shows only that the business *may have been* a significant motivation. The stipulation leaves open the possibility that it was not.

Any taxpayer owning stock in a corporation by which he is employed can probably claim to have entered a transaction like that in this case with the benefit to his employment status in mind. In order to obtain the full deduction, however, the taxpayer must reasonably show that the business considerations were more than incidental, *i.e.*, he must produce evidence negating the possibility that investment considerations were so important that the transaction would have been undertaken even had the business considerations been entirely absent. Failing such a showing, the court cannot conclude that the taxpayers' activity was not peculiar to investment purposes.

Without indicating all of the factors that would govern this case under the significant motivation standard, it can be noted that among the relevant elements would be a comparison of the amount of the taxpayers' salaries and the value of their stock ownership, the reason for their desire to retain their positions with the corporations, and the past history of the taxpayers' financial dealings and of their employment. Without such evidence, the decision of the district court cannot be sustained.

My disagreement with the majority stems from my belief that although the stipulation did not sufficiently establish the significant business motivation necessary to permit the taxpayers to deduct their losses as a business bad debt, we should not hold on the present record that they are completely barred from claiming the deduction.

A stipulation is entered into by parties for their mutual convenience and to expedite the disposition of litigation, and should not be given any greater effect than that intended. In this case I believe the taxpayers entered into the stipulation under the misapprehension that it sufficiently showed the evidence necessary to secure the deduction. If there had been no stipulation, it is highly probable that evidence of the kind necessary to support a full deduction by the taxpayer, at least under the significant motivation test, would have been brought out at trial.

In the present state of the record, for instance, we do not even know the exact amount of the taxpayers' salaries and the size of their stock holdings. Certainly, probative evidence of this nature on the issue of motivation would have been developed at a trial. Thus the stipulation, if given conclusive effect, is a windfall to the Government because it prevents the taxpayers from adducing the evidence necessary to try to justify their claim.

I believe the courts have the discretion to relieve parties from insufficient, improvident and inept stipulations where to do so would prevent injustice.[10]

1968), agreeing with the Tax Court's application of the significant motivation standard in denying a bad debt deduction, and Decker v. United States, 244 F. Supp. 31, 37 (N.D.Iowa 1965).

10. *Cf.* Central Distributors Inc. v. M. E. T., Inc., 403 F.2d 943, 946 (5th Cir. 1968); Mitchell v. C. & P. Shoe Corp., 286 F.2d 109, 114 (5th Cir. 1960); Maryland Casualty Co. v. Rickenbaker,

In Knight Newspapers v. Commissioner of Internal Revenue, 143 F.2d 1007 (6th Cir. 1944), a deficiency was assessed against a corporation, a holding company, for failure to include in income a dividend paid by an affiliate. The taxpayer argued that the dividend was not income because its distribution was illegal and was subsequently rescinded. The case was tried on a stipulation before the Tax Court. That court held that the taxpayer had failed to meet its burden of proof because the evidence in the stipulation on the illegality of the dividend was not sufficiently dependable. The taxpayer's motion for rehearing, based on the contention that the inadequacy of the stipulation was due to oversight, was denied by the Tax Court. Holding that the Tax Court had erred, the court of appeals observed that "[t]he exercise of a sound discretion would seem to require that the court permit the taxpayer to establish facts which the parties to the litigation had, in good faith, considered covered by a stipulation." 143 F.2d at 1009. The case was remanded for the taking of further evidence.

Boston Edison Co. v. Campanella & Cardi Construction Co., 272 F.2d 430 (1st Cir. 1959), was a case in which a possible misunderstanding of the law led the parties to try the lawsuit on an inadequate stipulation of fact. Boston Edison, a utility company, held an easement over land adjacent to a tract condemned by the state of Massachusetts for construction of a highway. Two of the utility company's poles were damaged when the weight of an embankment built by a contractor caused the ground surface of the adjoining property to shift. The trial court dismissed the utility company's suit on the ground that legislation protected the contractor and limited the utility company to a remedy against the state.

The court of appeals held that the law protected the contractor only from liability for injuries to property necessarily incident to and unavoidable in the performance of his contract, and that the stipulation was insufficient to permit a finding on the issue. The court went on to say:

While it might be possible by application of rules of burden of proof and burden of going forward with evidence to reach some kind of a decision on the present record, we do not feel that this would ensure a just result [Footnote omitted.] In clear instances a court has power to relieve parties of a stipulation entered into under a misapprehension of law, * * * just as a new trial may be granted to prevent a miscarriage of justice. We accordingly remand the case to the district court to consider permitting the parties to vacate or amplify their stipulation or to take such other steps as the court may approve. 272 F.2d at 433–434.

A similar result was reached in Aetna Life Insurance Co. v. Barnes, 361 F.2d 685 (5th Cir. 1966). There the trial court had erroneously allowed recovery on a theory clearly barred by a group disability insurance policy. However, there was a possibility of recovery on a different basis which had been overlooked by the plaintiff. As the stipulation upon which the case was tried was insufficient to support a conclusion on the applicability of the alternate theory, the court remanded the case for consideration of whether justice required that the plaintiff be afforded an opportunity to withdraw from the stipulation and present further evidence.[11]

146 F.2d 751, 753 (4th Cir. 1944); Bradford v. Schmucker, 135 F.2d 991, 996 (10th Cir. 1943); Snyder v. Dravo Corp., 6 F.R.D. 546, 551 (W.D.Pa.1947). See generally Annot., 161 A.L.R. 1161 (1946).

11. The court said:
Of course it is not for us to remake the record or to reject that which the parties by their formal stipulation have proffered to the trial, and now to this Court. But since these policy provi-

In Brast v. Winding Gulf Colliery Co., 94 F.2d 179 (4th Cir. 1938), a tax case in which a taxpayer was permitted to withdraw from a damaging stipulation, the court said:

> Where facts subsequently developed show, with respect to a particular matter, that a stipulation was inadvertently signed, the party may be relieved where there is no prejudice to the opposite party. 94 F.2d at 181.

And further:

> The government collected taxes which it had no right to collect. * * * By this action [relieving the taxpayer from the stipulation] the government suffered no prejudice. It was only required to refund the sum it had collected, which it had no right to collect. 94 F.2d at 182.

Likewise in the present case, if the taxpayers were ultimately able to support their claim under § 166, the Government would suffer no legal prejudice if it were required to allow the bad debt deduction.

It appears that inadequacy of the stipulation here, like that in *Boston Edison,* was due to a misapprehension of the legal elements of proof of the taxpayers' claim.[12] Therefore, I would remand to the district court for consideration of whether the interests of justice require the court to exercise its discretion to relieve the taxpayers of the stipulation and to allow presentation of further evidence.[13] To repeat, I would do so on the basis that even if appellees cannot come within the primary motivation test, the proper rule to follow in determining the allowance of a business bad debt deduction under § 166 is whether there is a significant motivation. To that end appellees may be entitled to the opportunity to offer proof that they come within what I conceive to be the correct test.

sions have such an immediate and perhaps decisive impact, we think that in the administration of justice. * * * the reversal of the judgment on the theories directly presented should not prejudice the right of the Employee to pursue this theory on remand. Especially is this so since the stipulated facts as to the critical element of termination of employment (and hence insurance) are stated in conclusory, not evidential, factual terms. 361 F.2d at 690.

12. Such misapprehension may be understandable in view of the uncertain case law in this area. As has been observed in a somewhat different context, a taxpayer may be relieved of the effect of a stipulation "entered into under a mistake of law induced by the then existing state of the case law * * * if no prejudice results." Logan Lumber Co. v. Commissioner of Internal Revenue, 365 F.2d 846, 855 (5th Cir. 1966).

13. Of course appellees would be required to submit a petition to the district court asking for such relief and alleging grounds for relieving them of the stipulation. See Morse Boulger Destructor Co. v. Camden Fibre Mills, 239 F.2d 382 (3d Cir. 1956). It is understandable that taxpayers have not acted before as they prevailed below. Furthermore, from my examination of the briefs of the parties submitted in the lower court it appears that the adequacy of the stipulation to support a deduction under the significant motivation theory was not before the district court.