FRED W. MARQUART, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent GRACE H. MARQUART, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Marquart v. Commissioner
Docket Nos. 4822-73, 4823-73.
United States Tax Court
T.C. Memo 1975-117; 1975 Tax Ct. Memo LEXIS 253; 34 T.C.M. (CCH) 572; T.C.M. (RIA) 750117; April 30, 1975, Filed. Robert H. Wyshak and Lillian W. Wyshak, for the petitioners. Robert G. Martinell, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: In these consolidated proceedings, respondent determined the following deficiencies in petitioners' Federal income taxes: Fred W. Marquart
Grace H. Marquart Year
Docket No. 4822-73
Docket No. 4823-73
1965
$6,959.00
$ 7,259.00
1966
7,857.00
7,557.00
1967
6,907.50
7,207.50
1968
9,262.00
9,262.00
On their separate Federal income tax returns for 1968, each petitioner claimed an ordinary loss of $76,750. With respect to part of this claimed loss, a tentative net operating loss carryback adjustment from 1968 to 1965 through 1967 was allowed. On examination of petitioners' returns, the deficiencies were determined, and the following issues are presented for decision: 1. Whether losses which petitioner *256 Fred W. Marquart statained in 1968 from the guarantee of a note of a corporation in which he acquired stock and a loan to that corporation are deductible as business bad debt losses under section 166(a) [1] or as nonbusiness bad debt losses under section 166(d); alternatively, whether the loss attributable to the guarantee of the corporation's note is deductible as a loss on a transaction entered into for profit under section 165(a). 2. Whether attorneys' fees incurred in connection with the claim attributable to the guarantee of the corporation's note are deductible under section 162(a), as ordinary and necessary business expenses, or under section 212(2), as expenses incurred in the management of property. 3. Whether attorneys' fees incurred for an analysis of the tax consequences of the settlement of the note guarantee controversy, the preparation of petitioners' income tax returns for 1968, and a claim for a tentative net operating loss carryback adjustment are deductible under section 162(a) as an ordinary and necessary business *257 expense or section 212(3) as an expense incurred in connection with the determination, collection, or refund of any tax. 4. What was the amount of a casualty loss under section 165(c) suffered by petitioners in connection with damages to an automobile when it was stolen on two occasions in 1968? FINDINGS OF FACT General
Fred W. Marquart and Grace H. Marquart, husband and wife, were legal residents of California when they filed their petitions. For the years 1965 through 1968, they filed separate individual income tax returns with the district director of internal revenue at Los Angeles, California. The business activities which produced the losses here in dispute were conducted by Fred W. Marquart, and he will be referred to herein as petitioner. 1. Guaranty and Bad Debt Losses
Petitioner obtained a bachelor's and a master's degree in business administration in the mid-1930's. His first job which utilized his business training was with Vick Chemical Company. In this position, he did market research work and ultimately became its marketing research director. His work included the screening of smaller corporations with a view to possible acquisition by Vick Chemical *258 Company. In several instances, Vick Chemical Company acquired the companies petitioner had studied. In 1945 or 1946, petitioner accepted employment with Cutter Laboratories as its director of corporate development, and remained in this position for 2 or 3 years. In this position, he screened many corporations for possible acquisition by Cutter Laboratories. One of the companies petitioner recommended for acquisition was Hyland Laboratories, but Cutter Laboratories declined to follow his recommendation. Petitioner and an associate then acquired 48 percent of the stock in Hyland Laboratories and another 4 percent was held in escrow. In 1952 or 1953, Hyland Laboratories was merged into Baxter Laboratories. Petitioner entered the employment of Hyland Laboratories at or about the time of his acquisition of its stock and continued in that position for 20 to 25 years through 1968. Petitioner's work with Hyland Laboratories gave him a wide circle of acquaintances in the business community. He became acquainted with many bankers, accountants, and members of professional groups. While employed by Hyland Laboratories, petitioner invested funds in or loaned funds to various enterprises. *259 Petitioner invested $3,000 or $4,000 in the common stock of a corporation referred to as Pink and Blue, which was engaged in the promotion of merchandise needed for newborn babies. Pink and Blue failed and, on his 1965 income tax return, petitioner claimed a capital loss on his investment. Petitioner acquired a 5 to 7 percent interest in Sheridan Gray, which merged into G.B.T. Corporation prior to its liquidation in 1968; petitioner reported his gain on the liquidation as capital gain. Petitioner sold his stock in Baxter Laboratories (formerly Hyland Laboratories) in 1968, and reported the gain as long-term capital gain. In 1953 or 1954, petitioner invested about $10,000 in Azon West Coast Corporation, acquiring 20 to 25 percent of the stock. From time to time, petitioner borrowed money from a bank and loaned it to Azon West Coast Corporation at the same rate of interest he paid the bank. He sold the stock for a profit in 1958 or 1959. Petitioner guaranteed a bank loan to Trontz of California, a partnership, which went into bankruptcy in 1968. Mr. Trontz was petitioner's neighbor. Mr. Trontz neither paid nor agreed to pay petitioner anything for the guarantee. In the mid-1960's, *260 petitioner loaned $28,000 to the Royal Wax Museum, taking real estate as security. Petitioner made this loan at least in part because the sole stockholder of the museum was a personal friend. Similarly, sometime between 1966 and 1968, petitioner loaned $10,000 to Dave Vaile, an acquaintance, for his use in a yacht brokerage business. In late 1962, petitioner and Stewart Ramsay (hereinafter Ramsay) paid Fred E. and Helen B. Sindars (hereinafter the Sindars) $1,000 for a corporate shell, Air Conductors, Inc. (sometimes herein the corporation), which had been organized in 1955 but had never been activated. In December 1962, petitioner and Ramsay each paid $31,000 into Air Conductors, Inc. These amounts were recorded on its books as loans. On or about December 3, 1962, Air Conductors, Inc., entered into an agreement for the acquisition of the assets and business of Air Conductors, Ltd., a limited partnership. The partnership was engaged in the business of the manufacture and sale of plastic tubing and insulating materials and devices, primarily to aircraft and missile manufacturers. As consideration for the purchase, which was closed through an escrow on December 12, 1962, the corporation *261 paid cash and issued two promissory notes to the Sindars in the amounts of $150,000 and $9,000. Petitioner and Ramsay guaranteed the two notes. On December 7, 1962, the board of directors of Air Conductors, Inc., authorized and directed the officers of the corporation to apply to the California Commissioner of Corporations for a permit to issue 62,500 shares of class B common stock with a par value of $1 per share. A permit to issue the shares was granted on April 2, 1963. On April 26, 1963, 25,000 shares of class B common stock were issued each to petitioner and Ramsay. O. P. Graff (hereinafter Graff) paid $12,500 into the corporation and received 12,500 shares of similar stock. Petitioner paid for his shares with $25,000 of the $31,000 originally shown on the corporation's books as a loan. Sometime in December 1962, petitioner borrowed $40,000 from a bank and, without security, loaned the money to Air Conductors, Inc. The corporation issued its note to petitioner in the same amount on December 12, 1962. The note carried the same interest rate as petitioner paid the bank. Air Conductor's debt to petitioner became worthless in 1968. On May 7, 1963, the articles of incorporation *262 of Caldena Corporation (hereinafter Caldena) were filed with the California Commissioner of Corporations. Shortly thereafter, the shareholders of Air Conductors, Inc., transferred their stock to Caldena, and 400 shares of Caldena's common stock was issued to petitioner, 400 shares to Ramsay, and 200 to Graff. In December 1968, Caldena was liquidated and dissolved. At that time petitioner, Ramsay, and Graff owned all of its stock, and they received nothing. Air Conductors, Inc., defaulted on the notes to the Sindars, and they sued petitioner, Ramsay, and the corporation. A judgment was entered against the three defendants in the amounts of $96,545.88 plus interest from August 15, 1964, and $9,000 plus interest from July 15, 1964. On August 21, 1968, the parties to that lawsuit entered into a settlement agreement whereby the Sindars agreed, among other things, to accept $106,000 in full satisfaction of the judgment. By check dated June 25, 1968, petitioner paid the Sindars the agreed amount. No contribution was made by either Ramsay or Air Conductors, Inc., because neither had the financial resources to make a contribution. Air Conductors, Inc., also defaulted on the $40,000 note *263 given to petitioner on December 12, 1962. Although Ramsay had guaranteed payment of one-half of the note, he was financially unable to perform on his guarantee. 2. The Attorneys' Fees
In order to defend the action brought by the Sindars, petitioner was required to engage counsel. In 1968, petitioner paid his counsel $2,500 for effecting the settlement. In addition, petitioner was required to engage counsel to analyze the tax aspects and incidence of the $106,000 settlement payment. For these services, petitioner paid $5,000 in 1968. 3. The Casualty Loss
In 1966, petitioner purchased a new Volkswagen automobile for for $2,200 for the use of his daughter, Nancy. On July 15, 1968, the automobile was stolen in Los Angeles and was recovered by the police in Denver, Colorado, on August 8, 1968. The automobile had been severely damaged, and extensive repairs were required. At the time of its theft, the automobile had a value of about $1,320. Its fair market value in its condition when it was recovered was $150. Upon recovery of the automobile, petitioner had the automobile repaired. It was stolen again in Los Angeles on September 12, 1968, and was recovered by the San Diego *264 police on or about October 5, 1968. Again the automobile had been damaged, and $107.47 was expended to repair it. Its fair market value at the time of this theft was about $1,200. OPINION 1. The Bad Debt Losses
Section 166(a) provides a deduction for the full amount of any debt which becomes worthless during the taxable year, but section 166(d) renders that provision inapplicable to nonbusiness bad debts. Section 166(d)(2) defines a nonbusiness debt to mean-- a debt other than--(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. Losses attributable to nonbusiness debts are accorded the same treatment as losses on the sale or exchange of a capital asset held for not more than 6 months. Under section 166, the character of a bad debt is determined by the relationship it bears to the taxpayer's trade or business. Only if the debt bears a proximate relationship to the taxpayer's trade or business will it qualify for business bad debt status under section 166(a). Whipple v. Commissioner,373 U.S. 193, 201 (1963); *265 sec. 1.166-5(b), Income Tax Regs. And whether a debt has a "proximate" relationship to the taxpayer's trade or business is determined by the taxpayer's "dominant motivation" in creating the debt. United States v. Generes,405 U.S. 93, 103 (1972). Within this framework, respondent has determined, and we agree, that petitioner's losses attributable to his loan of $40,000 to Air Conductors, Inc., and his guarantee of the corporation's notes totaling $159,000 to the Sindars are deductible only as nonbusiness bad debts. We find no proximate relationship between these obligations and any business in which petitioner was engaged during the tax years. We think petitioner's dominant motive in making the loan and guaranteeing the purchase money notes was to acquire what he hoped would be a profitable investment. Petitioner's income tax returns for 1965 through 1968, read in conjunction with those of petitioner Grace H. Marquart, show that he was employed as an executive for Hyland Laboratories, drawing a salary of at least $50,000 per year. His work as an executive for Hyland Laboratories, which majored in the drug field, had no connection with Air Conductors, Inc. *266 , which manufactured plastic materials and insulating devices primarily for aircraft and missile manufacturers. Petitioner's main argument is that he was in the business of financing and promoting corporations, as well as working for Hyland Laboratories, and that he suffered the disputed losses in that separate business. However, we do not think this argument will bear the light of analysis. True, petitioner's employment with Vick Chemical Company and Hyland Laboratories gave him a wide circle of friends in the financial world and broad experience in analyzing and evaluating the economic prospects of business ventures, and as the years have passed, he has personally made loans to or investments in several enterprises. But his activities in this respect do not constitute a business. Petitioner borrowed most of the money he used to make loans to the various enterprises, such as Azon West Coast Corporation and Royal Wax Museum, which were almost invariably wholly owned by personal friends or acquaintances. In each case, however, petitioner, in giving his testimony, could not recall the interest rate he charged on such loans, or he admitted that he charged the same rate as he was required *267 to pay for the funds he borrowed. Obviously, such testimony is not sufficient to show that petitioner was engaged in financing and promoting corporations as a means of earning interest income. As to the corporations in which he acquired stock, we do not think his activities were sufficient to constitute a business of financing and promoting corporations. Our Findings describe the significant transactions in which he engaged, and he handled those transactions as an ordinary investor. The only realistic inference from the evidence is that petitioner bought the stock in those corporations as investments, and he confirmed that interpretation in almost every case by reporting the financial results of the transactions on his income tax returns as capital gains or capital losses, depending upon the outcome. In no instance does any concrete evidence show that petitioner organized or acquired a corporation, financed it, promoted it, or otherwise groomed it for sale for a fee or commission or for sale at a profit. See Whipple v. Commissioner,supra at 202-203. Alternatively, petitioner contends that the $106,000 lost as a result of his guarantee of the Air Conductors, *268 Inc., notes to the Sindars is deductible without regard to section 166, presumably as a loss on a transaction entered into for profit under section 165(c) (2). But a series of recent cases has devitalized this contention; the allowability of the deduction is governed by section 166. See Stratmore v. United States, 420 F.2d 461, 465 (C.A. 3, 1970), certiorari denied 398 U.S. 951 (1970);United States v. Hoffman,423 F.2d 1217 (C.A. 9, 1970); Bert W. Martin,52 T.C. 140, 144-146 (1969), affirmed per curiam 424 F.2d 1368 (C.A. 9, 1970); cf. Putnam v. Commissioner,352 U.S. 82, 90-93 (1956). We hold that petitioner's losses with respect to the $40,000 loan to Air Conductors, Inc., and the payment of the $106,000 to settle his liability to the Sindars on the notes totaling $159,000 are allowable as short-term capital losses under section 166(d). 2. The Attorneys' Fees
During 1968 petitioner paid and claimed deductions for attorneys' fees in the amounts of $2,500 for assistance in negotiating the settlement of the Sindars' lawsuit and $5,000 for an analysis of the tax aspects *269 of the settlement payment, preparation of tentative carryback adjustment claims, and preparation of the 1968 returns. We hold the $2,500 fee is deductible under section 212(2) [2] as an expenditure paid in connection with the management of petitioner's investment in Air Conductors, Inc. Since we have concluded that petitioner was not engaged in the business of organizing, promoting, and financing corporations, these fees are not deductible as ordinary and necessary expenses under section 162(a). The $5,000 fee is deductible under section 212(3) as an expense paid in connection with the determination, collection, or refund of the tax which was the subject of the tentative carryback adjustment. [3]
*270 3. The Casualty Loss
Section 165(c)(3) allows a deduction for losses of property from a casualty or theft to the extent that each loss from each casualty or theft, exceeds $100. The measure of the loss is the difference between the fair market values of the property before and after the casualty but may not exceed the adjusted basis in the property. Sec. 1.165-7(b)(1), Income Tax Regs. Applying these principles, we think petitioners have shown they are entitled to a casualty loss deduction of at least $449, the amounts claimed in their respective returns for 1968. To reflect the foregoing, as well as the settlement of other disputed items, Decisions will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.↩
2. SEC. 212. EXPENSES FOR PRODUCTION OF INCOME. In the case of an individual, there shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year-- (1) for the production or collection of income; (2) for the management, conservation, or maintenance of property held for the production of income; or (3) in connection with the determination, collection, or refund of any tax.↩
3. As to the effect of these deductions for attorneys' fees on the net operating loss carryback from 1968, see sec. 172(d)(4).↩