In the Matter of George Franklin VAUGHAN, Jr., Debtor.

UNITED STATES of America, Appellant,

v.

George Franklin VAUGHAN, Jr., Appellee.

No. 80-25.

United States District Court, E. D. Kentucky, Lexington Division.

July 8, 1982.

Joseph L. Famularo, U. S. Atty., Lexington, Ky., for appellant.

William L. Montague, Stoll, Keenon & Park, Lexington, Ky., for appellee.

MEMORANDUM OPINION AND ORDER

SCOTT REED, District Judge.

The above-styled action is before the Court as an appeal filed by the United States of America, seeking review of the United States Bankruptcy Court's Judgment and Order. Honorable Joe Lee, Bankruptcy Judge for the Eastern District of Kentucky, held that certain payments made by George Franklin Vaughan, Jr. (Vaughan), debtor, under the Plan of Arrangement to various landlords of restaurant sites were to be treated, for tax purposes,[1] as losses incurred in a transaction entered into for profit, though not connected with a

---

1. The Bankruptcy court, acting pursuant to a Chapter XI petition, has jurisdictional ability to adjudicate tax controversies that come before it. 26 U.S.C. Section 6871(a); *See Tatum v. Commissioner*, 612 F.2d 193 (5th Cir. 1980).

trade or business, 26 U.S.C. Section 165(c)(2).[2]

The Bankruptcy court's findings of fact are not in dispute. In order to fully understand the issue presented, however, a detailed recital of the Bankruptcy judge's pertinent findings of fact is necessary.

## FACTUAL BACKGROUND

On January 2, 1961, Vaughan formed a corporation known as Burger-Broil Systems, Inc. (Burger-Broil) which engaged in the business as franchisor of a chain of drive-in restaurants. Vaughan was the first president and principal shareholder of Burger-Broil.

During the period of time from July 1961 to 1965, Burger-Broil entered into numerous lease agreements covering proposed restaurant sites in various states. Under the lease agreements, the owner of the site agreed to erect thereon a restaurant building and allied facilities. In return, Burger-Broil obligated itself to lease the land and building at an agreed rental for periods of ten to twenty years.

During this initial period, Burger-Broil entered into twenty-two such lease agreements. Vaughan either signed the lease agreements individually as guarantor, or signed a separate guaranty agreement, obligating himself for the rental payments in the event the principal, Burger-Broil, should default.

Burger-Broil was a new and untested venture. Its capital structure and net worth position during the period of its existence were such that creditors of Burger-Broil required the guaranty of Vaughan on outstanding corporate notes.

The Burger-Broil enterprise did not prosper, however, and, by 1965, claims were being made against Burger-Broil and Vaughan; suits were filed in the various states, and, by September 30, 1965, at least four (4) suits had been instituted against Vaughan seeking to enforce his liability as a guarantor under the lease agreements for the full term of the various leases. Burger-Broil later filed a voluntary petition in straight bankruptcy in this district on December 23, 1965, and its assets were liquidated and distributed to creditors.

On September 30, 1965, Vaughan filed a petition for an arrangement under Chapter XI of the Bankruptcy Act[3] in this district. On Schedule A–5 of his petition, Vaughan listed twenty-two (22) Burger-Broil leases upon which he had guaranteed performance.

On December 27, 1966, the Bankruptcy court held that Vaughan was only liable under his lease guaranty obligations for the amount of rent due on said leases for a three-year period commencing November 3, 1965, the date of surrender of the various premises to the respective owners. 11 U.S.C. Section 753.

The proposed arrangement had Vaughan paying eleven lessors the full amount to which they were entitled under the Bankruptcy court's plan. In addition, other obligations of Burger-Broil for which Vaughan was liable as guarantor, and personal debts of Vaughan, were dealt with in the plan. The proposed plan also provided that the payment of the claims of the unsecured creditors allowed in the proceeding "shall not constitute payment of any debt of Burger-Broil, but rather shall constitute

---

**2.** Section 165 LOSSES

(a) *General Rule*—There shall be allowed as a deduction any loss sustained during the taxable year . . . .

.  .  .  .  .

(c) *Limitation on Losses of individuals*—In the case of an individual, the deduction under subsection (a) shall be limited to—

.  .  .  .  .

(2) losses incurred in any transaction entered into for profit, though not connected with a trade or business.

**3.** Section 403(a) of Public Law 95–598, 32 Stat. 2683, Bankruptcy Reform Act of 1978, provides that prior law and procedures apply to all actions filed before October 1, 1979. Therefore, the Bankruptcy Act and the Bankruptcy Rules existing prior to October 1, 1979, are applicable. Further, the very recent Supreme Court decision in *Northern Pipeline Co. v. Marathon Pipe Line,* —— U.S. ——, 102 S.Ct. 2858, 72 L.Ed.2d —— (1982), is inapplicable in the instant case.

payment by Vaughan for release from his obligations under his guaranty obligations." It was further provided that payment by Vaughan of any of the claims of the unsecured creditors arising out of the guaranty obligations on Burger-Broil's debts "shall not give rise to any right of subrogation by Vaughan against Burger-Broil, nor would Vaughan be entitled to share in any portion of any recovery made by such unsecured creditors against Burger-Broil."

The plan was accepted by the creditors and the Bankruptcy court entered an order confirming the plan. The order stated in part:

It further appearing to the Court that the amount to be paid, pursuant to the plan, to creditors of Burger-Broil, whose obligations were guaranteed by the Debtor, will not pay the full amount owed to such creditors by Burger-Broil, it is further ordered and adjudged that all payments made pursuant to the plan to the creditors of Burger-Broil whose obligations were guaranteed by the Debtor, shall be deemed to be consideration for a release of the guaranty obligations and not a payment of the obligations of Burger-Broil, and further ordered that the Debtor shall acquire no right of subrogation or other claim against Burger-Broil by reason of any such payments.

From December 31, 1969, until October 15, 1973, Vaughan paid the following principal amounts to the eleven landlords described above:

a. 1969—$26,508.00
b. 1970—$61,315.00
c. 1971—$54,683.00
d. 1972—$44,143.00
e. 1973—$69,085.00

Vaughan paid principal amounts to the other Burger-Broil creditors whose debts he had guaranteed in the amounts and in the years as follows:

a. 1969—$ 5,036.00
b. 1970—$15,457.00
c. 1971—$13,152.00
d. 1972—$10,847.00
e. 1973—$16,998.00

Vaughan filed timely federal income tax returns for each of the years 1969 through 1973. On those returns, Vaughan deducted against his ordinary income the amounts of the principal payments described above.

The payments made by the debtor under six of the Certificates of Indebtedness (the latter group described above) were in full satisfaction of the debtor's guaranty obligations.[4] Payments made under eleven of the certificates (the former group described above) were less than the amount of the debtor's contingent liability under those guaranty obligations.

The Bankruptcy judge held that the amounts paid in full satisfaction of debtor's guaranty obligations were deductible under 26 U.S.C. 166(d)[5] as a nonbusiness bad debt. The principal amounts paid in partial satisfaction of debtor's guaranty obligations, however, were held properly deducted by Vaughan under Section 165(c)(2), on his federal returns for the years 1969 through 1973 as losses incurred in a transaction entered for profit, though not connected with a trade or business.

## DISCUSSION

The precise issue before the Court is whether the principal amounts paid to the eleven landlords in the years 1969 through 1973, both inclusive, are deductible as a loss incurred in a transaction entered into for profit, though not connected with the debtor's trade or business (Section 165(c)(2)), or whether the payments are deductible as a nonbusiness bad debt (Section 166(d)). The Bankruptcy court decided in favor of de-

---

4. The tax consequences afforded these amounts are not disputed by the parties.

5. Section 166(d), NONBUSINESS DEBTS
  (1) GENERAL RULE—In the case of a taxpayer other than a corporation....

  (B) Where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year of a capital asset held for not more than six months.

ductibility under Section 165(c)(2). In resolving the issue, the Court cannot disturb or set aside the Bankruptcy court's conclusions of law unless they are erroneous. *In Re Visiting Home Service, Inc.*, 643 F.2d 1356 (9th Cir. 1981).

Although the parties are in agreement that the controlling case on the issue presented is *Putnam v. Commissioner*, 352 U.S. 82, 77 S.Ct. 175, 1 L.Ed.2d 144 (1956), they disagree concerning its interpretation. In *Putnam*, the Supreme Court decided that a guarantor of a corporate note, who suffered a nonbusiness loss upon his payment in full of the guaranteed debt, did not incur a loss deductible as one attributable to a transaction entered into for profit. The Court reasoned that *instanter* upon such payment the guarantor became subrogated to the rights of the original creditor. The Court stated that the guarantor's loss, due to his inability to recover from the debtor, was a loss attributable to the worthlessness of a debt and "deductible as such or not at all." [6]

The Bankruptcy judge believed that *Putnam* turned on the "presence of the technical right of subrogation." Because the claims of the eleven landlords were only partially satisfied, no right of subrogation ever passed to Vaughan. Therefore, the principal amounts paid by Vaughan were correctly deducted.

This Court does not read *Putnam* so narrowly. The Court is convinced that the well reasoned opinion in *Stratmore v. United States*, 420 F.2d 461 (3rd Cir.) *cert. denied*, 398 U.S. 951, 90 S.Ct. 1870, 26 L.Ed.2d 291 (1970) expresses the true essence of *Putnam*.

In *Stratmore*, the taxpayer had guaranteed certain corporate obligations. Subsequently, the corporation sought reorganization under Chapter XI of the Bankruptcy Act. A plan was approved whereby 25 percent of its obligations was discharged from bankruptcy, certain creditors demanded the remaining balance due from the taxpayers as guarantors. The taxpayers agreed to pay part of the debt owed these creditors in full satisfaction of their obligations as guarantors.

The taxpayers argued, as Vaughan does in the instant case,[7] that since they were relieved of their guaranty liability for less than the full amount due, they never became subrogated to the rights of the creditors. Therefore, because the taxpayers were not subrogated to the creditors' rights, there was no "debt" which became "worthless in their hands."

Significantly, the Third Circuit in an opinion by now Chief Judge Seitz, afforded little or no weight to the "subrogation as a *sine qua non*" argument stating:

the essence of *Putnam* is the view of the Court of the Congressional purpose behind section 166(c) and the part it was intended to play in the statutory scheme for a common tax treatment of all losses suffered by a corporate stockholder in providing his corporation with financing: these losses are to be treated as capital losses.

*Id.* at 465.

With this the Court agrees. To rely solely on subrogation as the determining factor would, in effect, afford greater tax benefits to those guarantors who simply make partial payments in satisfaction of their liability as guarantors. "*Putnam's* discussion of subrogation relates only to the question of whether the debt ... 'became' worthless ...; that discussion in no way relates to the entirely different question of *nondeductibility* of guarantors' losses under Section 165(c)(2)." *Martin v. Commissioner*, 52 T.C. 140, 146 (1969) *aff'd per curiam*, 424 F.2d 1368 (9th Cir. 1970) *cert. denied*, 400 U.S. 902, 91 S.Ct. 138, 27 L.Ed.2d 138 (1970). *See also Horne v. C.I.R.*, 523 F.2d 1363 (9th Cir. 1975); *United States v. Hoffman*, 423 F.2d 1217 (9th Cir. 1970). Accordingly,

---

**6.** Although *Putnam* was decided under the 1939 Code, the two provisions involved in the instant case are the same under the 1954 Code.

**7.** Kentucky law requires payment of the entire debt before subrogation is allowed. *See*, e.g. *Bryan v. Henderson Electric Co.*, 566 S.W.2d 823, 825 (Ky.App.1978).

whether Vaughan was subrogated to the rights of the creditors is not determinative of the issue presented. *Putnam* was decided on the broader ground "that payments in discharge of a guaranty are normally to be treated as bad debt losses." *Martin, supra* at 144.

In his attempt to distinguish *Stratmore*, Vaughan contends that "when he guaranteed the performance of the leases, he was not '*providing his corporation with financing.*'" 420 F.2d at 465 (emphasis supplied). The Court views the guaranty agreements as an indirect loan of Vaughan's financial resources to Burger-Broil. "There is no real or economic difference between the loss of an investment made in the form of a direct loan to a corporation and one made indirectly in the form of a guaranteed bank loan. The tax consequences should in all reason be the same." 352 U.S. at 92–93, 77 S.Ct. at 180.

Finally, Vaughan cites numerous post-*Putnam* cases for the proposition that *Putnam* did not foreclose guarantor transactions from being transactions entered into for profit. *See Condit v. Commissioner*, 40 T.C. 24 (1963), aff'd 333 F.2d 585 (10th Cir. 1964); *Martin v. Commissioner*, 52 T.C. at 147 (Featherston, J., concurring); *Rietzke v. Commissioner*, 40 T.C. 443 (1963); *Rushing v. Commissioner*, 58 T.C. 996 (1972); *Shea v. Commissioner*, 36 T.C. 577 (1961), aff'd per curiam 327 F.2d 1002 (5th Cir. 1964). These cases are distinguishable in that in the above-cited cases the individuals undertook guarantor obligations subsequent to and independent of the acquisition of their original investments. In the present case, however, Vaughan's guarantor obligations were contemporaneous with Burger-Broil's inception. Vaughan provided the needed financial backing and support necessary for Burger-Broil to obtain the leasing agreements.

Accordingly, the Court concludes that the principal amounts paid to the eleven landlords pursuant to the Certificate of Indebtedness, described in paragraph 13(1) through 13(11) of the Findings of Fact, in the years 1969 through 1973, both inclusive, are deductible only as nonbusiness bad debts under Section 166(d) of the Internal Revenue Code. The judgment of the Bankruptcy Court is reversed and the case is remanded for further proceedings consistent with this opinion.

