ESTATE OF MARTHA M. BYERS, DECEASED, FRANK M. BYERS, EXECUTOR, AND FRANK M. BYERS, SR., PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 1693–68.    Filed January 31, 1972.

*H. Thompson Nicholas, Jr.*, for the petitioners.
*Robert A. Roberts*, for the respondent.

DRENNEN, *Judge:* Respondent determined a deficiency of $22,043.76 in petitioners' Federal income tax for 1965, all of which was placed in issue by the petition filed herein. At the time of trial, petitioner Frank M. Byers, Sr. (hereinafter referred to as petitioner), amended his petition to claim an overpayment of Federal income tax for 1965, as a result of his erroneous designation of $29,323.45 as a short-term capital loss on his 1965 return.

The issue presented for our decision is whether the losses sustained by petitioner in 1965 from his direct loans to J. W. Jaeger Co., from payments made as guarantor of the trade accounts of that corporation, and from payments made to settle certain debts of that corporation, are deductible in full under either sections 162, 165, 166(a)(1), or 212, I.R.C. 1954, or are deductible only as nonbusiness bad debts under section 166(d) of the Code.

FINDINGS OF FACT

Some of the facts are stipulated and are so found.

Petitioner resided in Columbus, Ohio, at the time he filed the petition herein. He, individually and as executor of the estate of his deceased wife, Martha M. Byers, filed a joint Federal income tax return for the taxable year 1965 with the district director of internal revenue, Cincinnati, Ohio.

During the taxable year 1965 petitioner and his brother, George W. Byers, were engaged in the transportation business, which they had started in 1917 and incorporated in 1929. Since its incorporation in 1929, George Byers Sons, Inc., has principally engaged in the sale of automobiles and trucks. During that period the company has held contracts with General Motors and Chrysler Corp. In 1965, its truck sales were the second or third largest in the United States. At the time of the transactions in question, the business of petitioner and his brother was operated through various corporate structures, all, with one exception, wholly owned by the families of petitioner and his brother, or corporations controlled by those families. These corporations were:

(a) George Byers Sons, Inc., was the parent company of the organization and had as its principal business the sale of automobiles and trucks. Petitioner owned 37 percent of the outstanding stock of this corporation and was president.

(b) Byers Realty was a company engaged in the real estate rental business. Petitioner owned approximately 35 percent of the outstanding stock of the corporation and was president.

(c) Byers Enterprises, a corporation wholly owned by George Byers Sons, Inc., was a corporation engaged in automobile rentals. Petitioner was vice president of this corporation.

(d) Byers Parts was a company engaged in the wholesale distribution of automotive parts to jobbers and dealer representatives. Petitioner was vice president of this corporation and its stock was wholly owned by George Byers Sons, Inc.

(e) Reynolds, Inc., was a company engaged in the real estate rental business. Petitioner was president and owned one share of stock in this corporation.

(f) Columbus Finance, a small loan and discount company, was primarily involved in purchasing commercial paper from automobile and appliance dealers. Byers Realty owned 48 percent of the outstanding stock and the balance, except for 8 percent, was at all times held by members of petitioner's family or George Byers' family.

From 1950 through 1965, petitioner was chief operating officer of all the corporations controlled directly and indirectly by the Byers families. In that capacity he supervised the managers of all the related corporations. The total work force of these corporations exceeded 1,000 employees. His compensation for these services remained unchanged throughout that period. Such compensation was comprised of $3,000 per year plus 10 percent of the net earnings of the several corporations, limited to the maximum annual salary of $65,000.

George Byers served as chairman of the board and chief financial executive of the Byers family complex, playing a dominant role in corporate affairs as did petitioner. As majority shareholder George

Byers owned 63 percent of George Byers Sons, Inc., and he and his family owned substantial amounts of stock in the other Byers corporations. His compensation arrangement was the same as petitioner's, with a maximum annual salary of $75,000.

The two brothers' interests in the Byers businesses made them quite wealthy. George Byers estimated his personal net worth at 4 or more million dollars.

The Byers family corporations had a firmly established operating policy that prohibited corporate loans or surety of lines of credit to any individual or business, including extensions to company officers and employees, and intercorporate loans. George Byers Sons, Inc., was liable as endorser on all commercial paper taken for the purchase of cars and trucks, but beyond this necessary procedure in the sale of transportation equipment, the corporations engaged in no lending or guarantee activities. The maintenance of a highly liquid position to facilitate financing automobile and truck inventories was the principal reason for this restrictive credit policy. Because of the company's highly liquid position it could borrow very large sums of money at favorable interest rates without any collateral. This permitted the companies to pay cash to their suppliers for inventory purchased and avoided having to floor plan their inventories.

As a result of the corporate policy of not making any loans to officers, employees, and customers, petitioner and his brother had an extensive history of personally lending financial assistance to employees and customers of George Byers Sons, Inc., and its related entities. That financial assistance took various forms which included direct cash loans and guaranteeing customer and employee credit. The amounts involved in these transactions ranged from $100 or less to hundreds of thousands of dollars. The loans and guarantees were used for activities as varied as the individual and business borrowers, and included the purchase of truck license plates, purchase of merchandise by truckers for transportation to other cities, satisfaction of bad checks, deposits to meet payrolls, general assistance in a new business or acquisition of business property, maintenance of a college student, or purchase of a residence. The loans or guarantees were all to business-oriented acquaintances and were seldom, if ever, made because of a personal or social relationship. However, petitioner only rarely charged interest or took any security for the loans, and he maintained no organized books or records of amounts owed him. Moreover, petitioner's loan procedure was so casual that he generally carried a sizable amount of cash with him at all times to make spontaneous loans immediately on the request of those financially distressed. Nevertheless petitioner seldom suffered losses from his lending activities; he was usually repaid the full amount advanced by the borrower.

As a result of his rather informal and benevolent personal lending procedures over a period of four decades, petitioner occasionally had the opportunity to acquire profitable businesses for George Byers Sons, Inc.,[1] and he successfully cultivated a significant amount of goodwill and loyalty among his debtors. Over the years, this personal goodwill has been one reason for a large number of truck and automobile sales in the Byers' transportation business.

In the taxable year 1965 petitioner suffered certain losses as a result of cash advances, purchases of outstanding accounts, and settlements of unsatisfied lines of credit for J. W. Jaeger Co., an Ohio corporation engaged in the wholesale food-distributing business. Petitioner's relationship with the Jaeger Co. began in the late 1930's. Over the years the Jaeger Co. purchased approximately $400,000 in trucks from George Byers Sons, Inc., and also leased transportation equipment from the company. In 1959, George Byers Sons, Inc., was liable as endorser on commercial paper of the Jaeger Co. in the amount of approximately $40,000.

The losses suffered by petitioner in 1965 arose from the fact that J. W. Jaeger Co., a longtime active customer of George Byers Sons, Inc., experienced financial liquidity problems in 1960. At that time, Frank Jaeger, Jr., who was operating the Jaeger Co. in Columbus and who had done considerable business with petitioner and the Byers companies, asked petitioner for financial assistance so that he might pay off certain pressing corporate obligations. As a result of his request, petitioner from 1960 through 1963 personally settled a series of outstanding debts of J. W. Jaeger Co. with the following creditors:

| Payee | Date | Amount paid |
|---|---|---|
| Mellon National Bank | Jan. 14, 1961 | $7, 475. 00 |
| International Milling | Feb. 23, 1961 | 6, 466. 95 |
| General Mills | Feb. 23, 1961 | 2, 946. 54 |
| Revere Sugar | June 25, 1960 | 3, 500. 00 |
| Proctor & Gamble | July 8, 1960 | 600. 00 |
| North Dakota Mill & Elevator | July 18, 1960 | 2, 998. 75 |
| Atkinson Milling | Sept. 2, 1960 | 2, 278. 40 |
| Buest Hincke Milling Co | Sept. 2, 1960 | 1, 853. 42 |
| Geo. Phelps Rose & Son | Sept. 30, 1960 | 120. 34 |
| Hackmeister, Inc | Sept. 30, 1960 | 95. 17 |
| Springfield Milling | June 19, 1963 | 988. 88 |
| | | 29, 323. 45 |

---

[1] For example, in 1927 petitioner gave Sy Hill some financial help in his taxi business. Subsequently, Mr. Hill became a regular automobile customer of George Byers Sons, Inc. In 1950 George Byers Sons, Inc., acquired the Hill Cab Co. for $150,000. After operating the company for 10 years, George Byers Sons, Inc., sold the cab company, realizing an overall net profit from the operations and sale of approximately $800,000.

A similar situation, where petitioner lent money to a man named Alexander, led to the purchase of a car-leasing franchise from Alexander's estate for $250,000. This business is now owned and operated by George Byers Sons, Inc., as Byers Enterprises and has an estimated value of $3 million.

Petitioner received assignments of the outstanding debts from the various creditors when he settled the company's liabilities.

J. W. Jaeger Co. has never made any cash payments to petitioner for the corporate obligations he paid in the amount of $29,323.45. However, Frank Jaeger, Jr., did voluntarily offer to assign approximately 45 percent of the stock of J. W. Jaeger Co. to petitioner as security for repayment of the amounts advanced.[2] As an additional inducement Frank Jaeger gave petitioner financial statements of the J. W. Jaeger Co. for the year ending April 30, 1960, and later periods. The April 30, 1960, financial statement reflected a net worth of $107,393.80 and gross sales of over $1,600,000.

Between 1962 and 1965 petitioner advanced sums totaling $33,200, directly to J. W. Jaeger Co. During that same period, Frank Jaeger, Jr., made repayments in the total amount of $4,500. However, $28,700 of the amounts advanced directly to J. W. Jaeger Co. has never been repaid.[3]

Additionally, during 1964, petitioner entered into guarantee agreements with two of the suppliers of J. W. Jaeger Co. to insure certain limited amounts of credit. As a result of these guarantees, petitioner in 1965 paid $15,298.63 on behalf of J. W. Jaeger Co. for which he was never reimbursed.

J. W. Jaeger Co. was insolvent and ceased doing business in the late fall of 1965. Since that date it has not resumed operations and at the time of trial it had no assets. On December 31, 1965, petitioner had paid a total of $73,322.08 to J. W. Jaeger Co. or to its creditors for which he had not been reimbursed.[4]

All the financial assistance given the Jaeger Co., as outlined above was given because of the business relationship between the Jaeger Co. and petitioner and his various companies. The assistance was not given because of any personal or social relationship between petitioner and Frank Jaeger, Jr. Frank Jaeger, Jr., was not personally liable to petitioner for any of the indebtedness. It was a Jaeger Co. obligation.

On his return for the taxable year 1965, petitioner reported the $29,323.45 referred to above paid to creditors as a capital loss. The

---

[2] At the time of trial, petitioner had no recollection of receiving that stock, and the certificates could not be produced by either party. However, petitioner did list 198 shares of common stock and 602 shares of preferred stock of J. W. Jaeger Co. on his Franklin County, Ohio, property tax return at the close of each of the taxable years 1962 through 1965.

[3] Frank Jaeger did give petitioner a number of checks drawn on J. W. Jaeger Co. to repay the advances, but petitioner never did deposit them since he knew the checks were not covered by sufficient funds.

[4] This figure is a result of the following amounts:

| | |
|---|---|
| Payments to J. W. Jaeger creditors Jan. 14, 1961, to June 19, 1963 | $29,323.45 |
| Direct cash advances to J. W. Jaeger Co. Aug. 27, 1962, to May 1, 1965 | 28,700.00 |
| Satisfaction of J. W. Jaeger Co. debts under 1964 guarantee agreement | 15,298.63 |
| | 73,322.08 |

return attributed the loss to the worthlessness of an investment in J. W. Jaeger Co. Petitioner reported other capital losses which exceeded $1,000 net. In his amended petition this loss is claimed as a business loss and gives rise to petitioner's claim of overpayment of his taxes.

Additionally, petitioner claimed a business loss in the amount of $43,998.63 arising from his transactions with the defunct company.[5] Respondent in his notice of deficiency disallowed this deduction as a loss incurred in a trade or business, asserting instead, that the loss was deductible as a nonbusiness bad debt under section 166(d) of the 1954 Internal Revenue Code.

Petitioner also took a deduction on his 1965 return for attorney's fees in the amount of $2,950 in connection with the loans and guarantees related to the Jaeger Co., which respondent disallowed.

Petitioner has never considered himself to be in the business of loaning money, nor does he consider himself a professional promoter. His principal source of personal income is the Byers corporate organization, from which he derived a $65,000 annual salary and substantial dividends paid on his proportionate ownership.

The losses suffered by petitioner in 1965 relative to the J. W. Jaeger Co. resulted from the worthlessness of debts which were not created or acquired in connection with, nor incurred in, petitioner's trade or business.

OPINION

The primary question is whether the payments made by petitioner to J. W. Jaeger Co. and its creditors give rise to deductions as ordinary and necessary business expense;[6] or for losses incurred in a trade or business;[7] or losses incurred in a tranaction entered into for profit though not connected with a trade or business;[8] or expenses incurred in the production of income;[9] or whether they constitute business bad debts,[10] or nonbusiness bad debts.[11]

Respondent contends that the payments give rise to bad debt deductions instead of losses deductible under other provisions of the Internal Revenue Code of 1954. Respondent further asserts that the bad debts are deductible only as nonbusiness bad debts and therefore must be

---

[5] The $43,998.63 deduction consisted of:

| | |
|---|---:|
| Cash advances to J. W. Jaeger Co. Aug. 27, 1962, to May 1, 1965 | $28,700.00 |
| Satisfaction of J. W. Jaeger Co. debts under 1964 guarantee agreement | 15,298.63 |
| | 43,998.63 |

[6] Sec. 162, I.R.C. 1954. All section references are to the Internal Revenue Code of 1954 unless otherwise indicated.
[7] Sec. 165(c)(1).
[8] Sec. 165(c)(2).
[9] Sec. 212(1).
[10] Sec. 166(a).
[11] Sec. 166(d).

treated as a loss from the sale of a capital asset held for not more than 6 months.[12]

Petitioner's position is that the losses he incurred from J. W. Jaeger Co., being motivated by business and profit considerations, are ordinary losses deductible in full as business bad debts, ordinary and necessary business expense, losses incurred in a trade or business, or expenses incurred for the production of income and for the conservation and maintenance of property held for the production of income, or any combination of the Internal Revenue Code provisions. He contends that the losses were not created or incurred in connection with the business of the corporations of which he was a stockholder and executive officer, but that they originated in his own business as a managing officer of various corporate enterprises engaged in the transportation business.

Petitioner's losses arose from direct advances to J. W. Jaeger Co., payments to the company's creditors on outstanding trade accounts, and payments as guarantor in settlement of Jaeger Co. lines of credit.

It is undisputed that the $29,323.45 loss was the result of payments petitioner made directly to the creditors of J. W. Jaeger Co. from 1961 through 1963. He settled these trade accounts and in return received assignments of the outstanding debts. As assignee, he became the creditor of J. W. Jaeger Co., entitled to all rights under the original debt. *Brod* v. *Cincinnati Time Recorder Co.*, 92 Ohio App. 26, 77 N.E. 2d 293 (1947). Thus, when he was unable to collect these accounts, his loss on those payments resulted from the worthlessness of that debt. The Supreme Court has held that a loss attributable to the worthlessness of a debt must be regarded as a bad debt loss, deductible as such or not at all. *Putnam* v. *Commissioner*, 352 U.S. 82, 88 (1956). See also *Stratmore* v. *United States*, 420 F. 2d 461 (C.A. 3, 1970) ; *Bert W. Martin*, 52 T.C. 140 (1969), affirmed per curiam 424 F. 2d 1368 (C.A. 9, 1970). Petitioner's payments of $29,323.45 to the creditors of J. W. Jaeger Co. therefore constitute a bad debt deductible solely under section 166.

Likewise, the petitioner's losses sustained from his direct cash loans to J. W. Jaeger Co. and his settlement of the company's overdue lines of credit under the 1964 guarantee agreements are bad debt losses of the same character. *Putnam* v. *Commissioner, supra; Stratmore* v *United States, supra; Crawford* v. *Turnbaugh*, 86 Ohio St. 43, 98 N.E. 858 (1912). Both cash payments created an obligation between Jaeger Co. and petitioner. One resulted from a direct debt, the other arose through subrogation. When these debts became worthless in 1965, the

[12] Sec. 166(d) (1) (B).

appropriate tax treatment was a section 166 bad debt deduction. *Putnam* v. *Commissioner, supra.*

We thus conclude that all financial assistance extended to J. W. Jaeger Co. by petitioner gave rise to bad debts, the losses from the worthlessness of which are deductible under section 166 and are not deductible under section 162, 165, or 212.

We next must decide whether the bad debts were section 166(a) business bad debts, or section 166(d) nonbusiness bad debts. If petitioner is right, and the losses are business bad debts, then he was correct in deducting the full $43,998.63 in 1965, and he is entitled to a tax refund from his improper treatment of the $29,323.45 as a short-term capital loss. However, if respondent is correct and the bad debts are nonbusiness in nature, then petitioner will be liable for the $22,043.76 tax deficiency assessed against him. The $29,323.45 having already been treated as a short-term capital loss, would mean that petitioner's 1965 tax liability from that amount would not be increased or decreased by a decision for respondent.

Section 166(d)(2) defines a nonbusiness bad debt as a debt of a taxpayer other than a corporation—

other than—

(A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or

(B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.

Since both parties agree petitioner is not in the trade or business of lending money for a profit, or of promoting, we can dispense with the second exception without further ado. *A. Kingsley Ferguson*, 16 T.C. 1248 (1951). We must then direct our attention to the first exception; i.e., whether the debts were created or acquired in connection with a trade or business of the taxpayer.

The question of whether these debts constitute business or nonbusiness bad debts is essentially one of fact, *Oddee Smith*, 55 T.C. 260 (1970), on appeal (C.A. 5, Mar. 2, 1971); *Stuart M. Sales*, 37 T.C. 576 (1961), the determination of which depends upon whether the debt is "proximately related" to the trade or business of the taxpayer, *Oddee Smith, supra*, on which question petitioner has the burden of proof in this case.

The Supreme Court considered this question in *Whipple* v. *Commissioner*, 373 U.S. 193 (1963), under somewhat different factual circumstances. There the petitioner made advances to and in behalf of a corporation he had formed to conduct a business unrelated to his regular business and in which he was the principal stockholder. Here petitioner made advances to and in behalf of a corporation which was a customer of the corporate complex of which petitioner was a

principal stockholder. Nevertheless, the Court's opinion in the *Whipple* case laid the guidelines for answering most of the questions that are raised in this case.

In *Whipple* the Court traced the concept of engaging in a trade or business, as distinguished from other activities pursued for profit, from the Revenue Act of 1916, through *Burnet* v. *Clark*, 287 U.S. 410, *Dalton* v. *Bowers*, 287 U.S. 404, *Deputy* v. *DuPont*, 308 U.S. 488, *Higgins* v. *Commissioner*, 312 U.S. 212, and the relevant amendments to the pertinent Code provisions made in the Revenue Act of 1942, which were designed to give relief to taxpayers such as those involved in *Higgins* who incurred expenses in the production of income but which activity did not qualify as a trade or business under the tax laws. The Court pointed out that the relief was afforded not by disturbing the Court's definition of "trade or business" but by enlarging the category of income with reference to which expenses are deductible. But at the same time, to remedy the abuses of permitting any worthless debt to be fully deducted, Congress restricted the full deduction under section 23(k) of the Internal Revenue Code of 1939 (the forerunner of section 166 of the 1954 Code) to bad debts incurred in the taxpayers' trade or business, and provided that nonbusiness bad debts were to be deducted as short-term capital losses. The Court thus concluded that under the amended statute the full deductibility of a bad debt turns on "its proximate connection with activities which the tax law recognizes as a trade or business, a concept which falls far short of reaching every income or profit-making activity."

In this setting the Court examined the activities of Whipple to determine whether he was engaged in a trade or business to which the debts were related, which involved the basic question of whether the furnishing of regular services to one or many corporations constitutes an independent trade or business. The Court concluded that devoting one's time to the affairs of a corporation is not of itself, without more, a trade or business of the taxpayer; and, since investing is not a trade or business, such activity, alone, does not constitute a trade or business. The Court also took care to point out that even if the taxpayer demonstrates an independent trade or business of his own, care must be taken to distinguish bad debt losses arising from his own business and those actually arising from activities peculiar to an investor concerned with, and participating in, the conduct of the corporate business. The Court concluded that the advances made by Whipple were not created, acquired, or incurred in a trade or business of his own and the losses therefrom were not deductible as business bad debts.

The Court, in *Whipple*, specifically left open the question of whether working as a corporate executive for a salary may be a trade or business, which the Second Circuit in *Trent* v. *Commissioner*, 291 F. 2d

669, reversing 34 T.C. 910, had answered in the affirmative. Compare *Kelly* v. *Patterson*, 331 F. 2d 753 (C.A. 5, 1964); *George P. Weddle*, 39 T.C. 493 (1962), affd. 325 F. 2d 849 (C.A. 2, 1963); *David J. Primuth*, 54 T.C. 374 (1970).

Examining the facts established by the record in this case in the light of the law established in the *Whipple* and other cases, we must rather reluctantly conclude that the losses suffered by petitioner in connection with his advances to and in behalf of the Jaeger Co. were losses from the worthlessness of nonbusiness bad debts. We say reluctantly because we are convinced that the advances made by petitioner in behalf of the Jaeger Co. were primarily motivated by business considerations and that petitioner will find it hard to understand why the losses arising therefrom should not be deductible as business bad debts. However, as we said in *Oddee Smith*, *supra*, while motivation is a factor to be considered, the taxpayer must first show that there was a relationship between the loans and resulting losses and a trade or business engaged in *by the taxpayer*. We think taxpayer has failed to show that all-important link here.

Petitioner admits he was not a moneylender or promoter by trade. He charged no interest on the loans he made, and any businesses he might have been led to acquire as a result of his lending activities, he turned over to one of the corporations at no direct profit to himself. His principal and only source of business income so far as the record reveals was his salary from George Byers Sons, Inc. Undoubtedly, he had sizable investment income from dividends and enhancement in value of his interests in the Byers companies and other corporations as well—but this was investment-type income which does not constitute a trade or business. *Whipple* v. *Commissioner*, *supra*; *Burnet* v. *Clark*, *supra*. The record reveals no business of petitioner independent of the automotive transportation business in which the Byers corporations were engaged.

Assuming, for the purposes of this discussion, that petitioner's activity as a corporate executive for a salary was a trade or business of his own, independent of the business of the Byers corporations, can it be said that the debts he acquired from his advances for the Jaeger Co. were proximately related to that business. The answer must be "No." The Jaeger Co. had been a good customer of the Byers corporations and it was undoubtedly to petitioner's benefit to help it meet its obligations and remain in business so it could continue as such. But, if this succeeded, it would benefit the business of the corporations and not the independent business of petitioner. There is no suggestion in the record that petitioner's maximum salary was in any way dependent on a continuation of the Jaeger Co. as a customer of his employer. Furthermore, it is clear that there was no obligation on the

part of petitioner to lend money to customers of his employer in order to retain his job. See *Niblock* v. *Commissioner*, 417 F. 2d 1185 (C.A. 7, 1969), affirming a Memorandum Opinion of this Court.

Petitioner argues that the transportation business which he and his brother had built was his business as well as that of the corporation. In a nonlegal sense we agree. However, it is well established that where a taxpayer chooses to do business in corporate form he must take the tax disadvantages along with the tax advantages. *Burnet* v. *Commonwealth Imp. Co.*, 287 U.S. 415 (1932); *Ernest H. Weigman*, 47 T.C. 596 (1967), affirmed per curiam 400 F. 2d 584 (C.A. 9, 1968). And the business of the corporation is not that of its stockholders. *Burnet* v. *Clark, supra; Royce W. Brown*, 54 T.C. 1475 (1970), affd. 448 F. 2d 514 (C.A. 10, 1971); *Estate of Dominick F. Pachella*, 37 T.C. 347 (1961), affirmed per curiam 310 F. 2d 815 (C.A. 3, 1962). As was said in *Deputy* v. *DuPont, supra*, the courts do not permit such a blending of the corporations' business with that of its stockholders. This should be particularly apropos in this case where the reason petitioner and his brother made personal loans to customers of the corporation was to make it possible for the corporation to obtain a credit rating which would permit it much more flexibility and lower financing costs in conducting the corporate business.

Respondent suggests that petitioner's advances were made to protect his investment or ownership interest in the Jaeger Co. While we have some curiosity as to why, if not for this reason, petitioner continued advancing funds to or for the Jaeger Co. long after it had encountered financial problems, the record does not support the conclusion suggested by respondent. Instead we find that it supports the conclusion that petitioner's lending activities in general, and to the Jaeger Co. in particular, were engendered in part by his generous and benevolent nature, and primarily because he thought it would benefit the business of the corporation, which it undoubtedly did. But such motivation does not proximately relate the debts and losses resulting therefrom to any independent business engaged in by petitioner,[13] *Niblock* v. *Commissioner, supra*, and we hold that the losses are deductible only as nonbusiness bad debts.

Petitioner offered no evidence with regard to the attorney's fees claimed as a part of the business losses on his return, so we must sustain respondent in disallowing these expenses for failure of proof.

*Decision will be entered for the respondent.*

---

[13] Compare *Stuart Bart, Jr.*, 21 T.C. 880, and *Frank Garlove*, T.C.Memo. 1965-201, where the clients or customers to which petitioners made loans were sources or potential sources of income to the taxpayers themselves in their principal trades or businesses. Also compare *Oddee Smith*, 55 T.C. 260, on appeal (C.A. 5, 1971), where the loans were made to protect the credit rating of the petitioner which was necessary for his principal business, and *Samuel R. Milbank*, 51 T.C. 805 (1969), where the loan was made to protect petitioner's integrity in the investment banking business, which was his principal and independent business.