JULIAN P. BARRY and FLORENCE T. BARRY, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Barry v. Commissioner
Docket No. 7629-71.
United States Tax Court
T.C. Memo 1973-280; 1973 Tax Ct. Memo LEXIS 7; 32 T.C.M. (CCH) 1332; T.C.M. (RIA) 73280; December 26, 1973, Filed *7 The petitioner was sole shareholder and president of a construction company which was engaged to construct a motel for Waxahachie Community Inn of America, Inc. Petitioner purchased a small percentage of the shares issued by the corporation and, as a shareholder, personally guaranteed loans made to the corporation. Since the motel business operated at a loss for several years after it commenced, petitioner sold his stock at a substantial loss and paid his portion of loan guarantees in 1967. Neither loss was incurred in connection with petitioner's trade or business. Held, the loss from sale of the corporation stock is deductible as a capital loss. Section 165(f), I.R.C. 1954. Held further, the loss arising from payments pursuant to the loan guarantees are nonbusiness bad debts, thus deductible as capital losses. Section 166(d) (1) (B), I.R.C. 1954. James D. Webb, III, for the petitioners. Bernard B. Nelson, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined deficiencies in petitioners' income tax for the taxable year 1967 in the amount of 2 $3,021.92. The issues for decision are: (1) Whether the loss arising from a sale *8 of stock is deductible under section 165 [1] of the Internal Revenue Code of 1954 as an ordinary or capital loss, and (2) Whether amounts paid pursuant to a loan guaranty are deductible under section 166 as business bad debts (ordinary loss) or nonbusiness bad debts (capital loss). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Julian P. Barry (hereinafter referred to as petitioner) and Florence T. Barry are husband and wife who were legal residents of Dallas Texas, at the time the petition was filed. They filed their Federal joint income tax return for 1967 with the district director of internal revenue in Dallas, Texas. Petitioner is the sole shareholder of Julian P. Barry General Contractor, Inc. (hereinafter referred to as General Contractor), a corporation engaged in the construction business. Petitioner is also president and chief executive of General Contractor, devoting his full time to the performance of duties arising from these positions. Substantially all of the petitioner's income 3 is derived from *9 his salary as president of the construction company. General Contractor has been in the construction business since its inception [2] and petitioner has not engaged in that business in an individual capacity since that time. Frank A. Blankenbeckler, Jr. (hereinafter referred to as Blankenbeckler), a resident of Waxahachie, Texas, conceived an idea to build a motel complex in that town because he believed that economic growth in the area made such an enterprise necessary and potentially profitable. He approached several friends and business associates in an attempt to gain their participation in such a project. Petitioner was not in the group originally approached. After determining that the original group was interested *10 in pursuing the project, an architect was hired to draw up preliminary plans. The motel was expected to develop into a profitable enterprise. Blankenbeckler then approached petitioner to obtain an estimate of construction costs of the motel if constructed by General Contractor. In November 1963, petitioner, as 4 president of General Contractor, made preliminary estimates of the cost of building the motel to be approximately $618,000. Blankenbeckler considered this figure to be too expensive. Thereafter petitioner, in conjunction with Blankenbeckler, worked to reduce the estimated cost of constructing the motel. In early April 1964, petitioner submitted an estimated cost of construction of $590,000, a figure acceptable to Blankenbeckler. After this cost figure had been determined, Blankenbeckler approached petitioner with an offer to participate in the project. This offer was made partly because of the long standing relationship between petitioner and Blankenbeckler and partly because Blankenbeckler determined that participation by petitioner would provide an incentive in constructing the motel. The award of the construction contract to General Contractor was not made contingent *11 upon petitioner's participation in the project. There were no other bids submitted on the project and no other construction company was considered for the job. Petitioner, because of his preliminary work, was generally familiar with the financial set up of the proposed project. On April 20, 1964, an organizational meeting was held for the formation of Waxahachie Community Inn of America, Inc. (hereinafter referred to as Waxahachie, Inc. or corporation), which was to construct and operate the motel. At the time petitioner purchased 2,500 shares (85,060 total shares were issued) of Waxahachie, Inc. stock at a price of $1.30 er share ($3,250). At the meeting, it 5 was voted to award the construction contract to General Contractor and it was also voted that no performance bond would be required. All of the shareholders of the corporation, including petitioner, agreed to supply funds in the aggregate amount of $80,000 to Waxahachie, Inc., if needed, for a period of two years after the incorporation. Petitioner's proportion of any amounts to be so loaned under this agreement was 2.5 percent. Also on April 20, 1964, all shareholders signed agreements whereby they guaranteed, on a basis *12 proportionate to their ownership of stock, a loan to Waxahachie, Inc. from Mercantile National Bank in Dallas, Texas. The total of this loan was $269,500, of which petitioner agreed to guarantee 2.78 percent ($7,500). In April 1965, General Contractor finished construction of the motel at a cost of $619,736.84 and final certificate for payment was submitted on April 5, 1965. On April 22, 1965, the shareholders signed agreements to guarantee (also on a proportional basis) a $50,000 loan to Waxahachie, Inc. from the Mercantile National Bank. Petitioner agreed to guarantee 2.5 percent ($1,250) of this loan. At least through 1968, the motel was operated at a loss. In order to meet the corporation's financial needs, the shareholders were required to make additional capital contributions as required under the April 20, 1964 agreement. Petitioner made further capital contributions as follows: 6 Date
Amount
6/1/65
$750.00
1/31/66
1,250.00
4/27/66
874.21
Waxahachie, Inc. also could not meet its liabilities to repay the loans obtained from the Mercantile National Bank. Pursuant to the guarantees signed on April 20, 1964 and April 22, 1965, petitioner paid $8,424.77 to Mercantile National Bank *13 on May 3, 1967, thereby terminating his liability under those agreements. Finally, on June 6, 1967, petitioner sold all of his shares in Waxahachie, Inc. to Builders, Inc. (one of the original shareholders of the corporation) for $25. On the 1967 Federal joint income tax return petitioner deducted the amount of $6,099.21 as a loss on small business stock under section 1244. [3] This amount constituted the amount originally paid for the stock ($3,250) plus the three contributions made ($750, $1,250 and $874.21) less the amount received for the stock ($25). Petitioner also deducted $7,973.17 as a long term capital loss from the sale of the stock of the corporation. ULTIMATE FINDING OF FACT The dominant motivation of petitioner in purchasing stock in Waxahachie, Inc. and guaranteeing loans made to it was investment, rather than business oriented. 7 OPINION Section 165[4] allows a deduction for losses incurred in a trade or business. Section 166[5] *15 allows ordinary loss deduction for any debt that becomes worthless during the year provided that it is not a nonbusiness debt. A nonbusiness *14 bad debt is defined as any debt other than one created in connection with or incurred in the taxpayer's trade or business. The 8 issue for decision is whether petitioner's purchase of Waxahachie, Inc. stock, guarantees of loans to Waxahachie, Inc. and subsequent payments were incurred in connection with petitioner's trade or business. Petitioner contends that the loss arising from the sale of the Waxahachie, Inc. stock is deductible as a loss incurred in a trade or business under section 165(c) (1) and that the payments made pursuant to the loan guarantees are deductible as losses on worthless debts incurred in connection with his trade or business under section 166(a). He also contends that the Waxahachie, Inc. stock is not a capital asset because it was purchased as an integral part of his trade or business. Respondent contends that neither the purchase of stock nor the guarantees were incurred in connection with petitioner's trade or business and any losses *16 arising from these items are not deductible as ordinary losses under section 165(c) (1) and 166(a). As to the purchase of Waxahachie, Inc. stock by petitioner, respondent also contends that the stock is a capital asset, the loss from the sale of which is 9 deductible only under section 165(f). As to the guarantee payments, respondent concedes that the guarantees created valid debts as required in Putnam v. Commissioner, 352 U.S. 82 (1956), and that the debts became worthless in 1967. The primary determination to be made in the case is whether petitioner's actions of purchasing stock and guaranteeing certain loans were incurred in connection with his trade or business. The first question raised is what is petitioner's trade or business. The construction business of General Contractor is not the trade or business of petitioner, its sole shareholder and president. Burnet v. Clark, 287 U.S. 410 (1932). Petitioner's activities of being the president and chief executive of General Contractor, to which he devoted his full time, are considered a trade or business. George P. Weddle, 39 T.C. 493 (1962), affd. 325 F.2d 849 (C.A. 2, 1963). In order to be deductible as ordinary losses *17 under section 165 or 166, however, the losses must arise in connection with petitioner's trade or business as an employee and not in connection with General Contractor's construction business. Petitioner contends that the purchase of Waxahachie, Inc. stock and subsequent guarantees were made by him in order to insure that the contract would be awarded to General Contractor and the latter thereby would have sufficient funds to pay petitioner his salary as an employee. The primary flaw in the argument is that the facts indicate that award of the construction contract was not dependent upon petitioner's participation in the project. Blankenbackler testified that he did not tie the construction contract and 10 petitioner's participation in the enterprise into one package. On the contrary, Blankenbeckler testified that he approached the petitioner with the offer as an action that would benefit both of them, i.e. benefit petitioner by providing him with an investment in what he hoped to be a profitable business and benefit the corporation by providing petitioner an incentive to do a good construction job. Petitioner testified that "* * * when I orignially purchased, it [Waxahachie Corporation *18 stock] I would have hoped that it would have made money." Also, no other construction company was approached or offered a competing bid for construction of the motel. From all the facts that have been presented, it is apparent that petitioner knew, even at the time of the offer and acceptance of part of the enterprise, that General Contractor was the only construction company that was in contention for the contract. Thus, General Contractor was never in danger of losing the contract and the wherewithall to pay his salary as president. Testimony was presented to the effect that petitioner participated in the enterprise in order to keep faith with the other shareholders, most of whom General Contractor had performed work for in the past and hoped to perform work for in the future. Even if we accepted this contention as the sole reason for petitioner's participation, it would not alter our conclusion. Such activity would (and evidently did) benefit the business of General Contractor, but such is not the trade or business of the petitioner. 11 See Estate of Martha M. Byers, 57 T.C. 568 (1972), affd. per curiam, 472 F.2d 590 (C.A. 6, 1973). Furthermore, in determining whether a loss *19 is incurred in connection with a taxpayer's trade or business under section 166(d), the test applied is the dominant motive of the taxpayer in entering into or paying the debt. United States v. Generes, 405 U.S. 93 (1972). The determination of whether a loss is incurred in connection with a trade or business under section 166(d) is made in essentially the same manner as whether the loss was incurred in a trade or business under section 165(c) (1). Section 1.166-5(g), Income Tax Regs., H. Rept. No. 2333, 77th Cong., 2d Sess. (1942), 76-77, and S. Rept. No. 1631, 77th Cong., 2d Sess. (1942), 90-91. Cf. Whipple v. Commissioner, 373 U.S. 193 (1963). In the Generes case, the Supreme Court stated that the dominant motive test applied to section 166(d) is consistent with the test applied under section 165(c) (1) and, further, that in these related areas consistency is desirable. Therefore, the test for determining whether a loss was incurred in connection with a trade or business for purposes of section 165(c) (1) is also the dominant motive of the taxpayer. This is especially true in the present situation, for the guarantees were made by petitioner only as a result of his status as *20 a shareholder of Waxahachie, Inc.Thus, petitioner must prove that his dominant motive in purchasing Waxahachie, Inc. stock and in guaranteeing its loans was business oriented rather than investment oriented. In light of petitioner's admission that he 12 hoped to make a profit on the stock, and the testimony of Blankenbeckler that the stock was offered at least partially as a good investment for petitioner to enter into, it cannot be said that petitioner has met his burden of proving that his dominant motive was a business one rather than investment. Also, the only business motives that petitioner has introduced relate to furthering the future business of General Contractor. As noted above, this does not go to the trade or business of petitioner. In support of his contention that the loss on the stock should be deductible as an ordinary loss, petitioner cites Corn Products Refining Company v. Commissioner, 350 U.S. 46 (1955); Western Wine & Liquor Co., 18 T.C. 1090 (1952); Tulane Hardware Lumber Co., 24 T.C. 1146 (1955); and Bagley & Sewell Co., 221 F.2d 944 (C.A. 2, 1955), affirming 20 T.C. 983 (1953), for the proposition that the stock would not be considered a capital asset under *21 section 1221. We see no need to delve at length into those cases. They involve situations in which a corporation, rather than a majority shareholder, purchased assets for purposes that were integrally related to the business of the corporation. As such, they are readily distinguishable from the present situation. More analogous to the present situation is the case of Charles W. Steadman, 50 T.C. 369 (1968), affd. 424 2d 1 (C.A. 6, 1970), certiorari denied, 400 U.S. 869 (1970). In the Steadman case, this Court held that stock purchased by a corporate officer 13 was not capital asset because it was purchased, at least partially, in order to prevent the taxpayer from losing his job as a corporate office. In that case the taxpayer's employment would have been in real jeopardy if he did not purchase the stock. In the present case there was never any danger that petitioner would lose his employment with his wholly owned construction company. Therefore, even if we held that the stock was purchased in connection with the taxpayer's trade or business, it would not be deductible under section 165(c) (1) because it is a capital asset deductible under section 165(f). In support of his contention *22 that the guarantee payments are deductible as ordinary losses under section 166(a), petitioner cites Trent v. Commissioner, 291 F.2d 669 (C.A. 2, 1961). That case involved a taxpayer who, upon request of his corporate employer, made loans to the corporation which subsequently became worthless. The court found that the loans were made by the taxpayer in order to retain his job. As noted above in connection with Steadman, supra, petitioner was never in any danger of losing his job with the construction company. Nor was petitioner even in any apparent danger of losing his salary, as the construction contract was never tied to his purchase of an interest in Waxahachie corporation. Thus, the Trent decision is distinguishable from the present situation. Furthermore, the action of all of the shareholders of Waxahachie, Inc., by virtue of their guarantees in 13 proportion to their corporate interests, evidence activities peculiar to investors concerned with and participating in the conduct of corporate business. This fact provides further proof that the dominant motive of the petitioner in making the guarantees was to protect petitioner's investment, not his trade or business of being *23 an employee. Petitioner has failed to sustain his burden of showing that protection of his trade or business of being an employee was his dominant motive for (1) the purchase of the Waxahachie corporation stock or (2) the guarantee agreements made on loans made to Waxahachie corporation.
Decision will be entered for the respondent. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue, unless otherwise indicated. ↩
2. There is some question as to the date of incorporation of General Contractor. At the trial, petitioner testified that it was incorporated in 1954. Petitioner's brief and several corporation tax returns of General Contractor placed into evidence, however, indicate a date of incorporation of June 15, 1961. For purposes of this case, it is sufficient to know that at least from 1961, General Contractor was engaged in the construction business as a separate entity. ↩
3. In his brief, petitioner conceded that the Waxahachie, Inc. stock does not qualify under section 1244. ↩
4. SEC. 165. LOSSES. (a) General Rule. - There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Lossess of Individuals - In the case of an individual, the deduction under subsection (a) shall be limited to - (1) losses incurred in a trade or business; * * * * * * * (f) Capital Losses. - Losses from sales or exchanges of capital assets shall be allowed only to the extent allowed in sections 1211 and 1212. ↩
5. SEC. 166. BAD DEBTS. (a) General Rule. - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * * (d) Nonbusiness Debts. - (1) General rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. ↩