ELDRED W. BARNES and GLORIA BARNES, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Barnes v. Commissioner
Docket No. 24399-81.
United States Tax Court
T.C. Memo 1985-456; 1985 Tax Ct. Memo LEXIS 178; 50 T.C.M. (CCH) 936; T.C.M. (RIA) 85456; August 28, 1985. George Constable, for the petitioners. Peter R. Hochman, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income tax for the calendar years 1975, 1976 and 1977 in the amounts of $27,253, $4,682 and $4,002, respectively. Some of the issues raised by the *179 pleadings have been disposed of by the parties, leaving for our decision only whether petitioners are entitled to deduct in the year 1975 as a loss or business bad debt an amount of $68,098.39 paid by Eldred W. Barnes (petitioner) on a note which had its origin in a loan made on September 6, 1974, to a corporation of which petitioner was a stockholder, or whether this amount should be treated as deductible only as a nonbusiness bad debt. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, now divorced, were husband and wife during the years here in issue. They filed joint Federal income tax returns for the calendar years 1975, 1976 and 1977 with the Internal Revenue Service Center in Fresno, California. At the time of the filing of the petition in this case, petitioner Eldred W. Barnes resided in Foster City, California, and petitioner Gloria Barnes resided in Hillsborough, California. Eldred W. Barnes is a general surgeon who has been engaged in the full-time practice of medicine in Burlingame, California, from 1954 until the time of the trial of this case. Dr. Barnes is a brother-in-law of Vincent H. D. Abbey. [1]
*180 The Seattle Totems Hockey Club, Inc. (Totems, Inc.), was incorporated in the State of Washington on September 3, 1958. The corporation currently exists in an inactive status. Mr. Abbey has been involved with Totems, Inc. since its inception in 1958. In late 1958, at the suggestion of Mr. Abbey, Dr. Barnes purchased some stock of Totems, Inc. Initially, Mr. Abbey and Dr. Barnes each owned approximately 10 percent of the Totems, Inc. stock, but by the late 1960's and from 1972 until early September 1974 they each owned 22.22 percent of the stock of Totems, Inc. From the inception of Totems, Inc., Mr. Abbey has been actively connected with the corporation. He has been an officer and director and has continuously held some office in Totems, Inc. Dr. Barnes has at times been an officer of Totems, Inc. but has not been as active in its corporate affairs as Mr. Abbey. The Seattle Totems, a minor league ice hockey team operated by Totems, Inc. was a member of the Western Hockey League (WHL). WHL was comprised of the Seattle Totems and the hockey teams of several other cities on the west coast of the United States and some cities in western Canada. The National Hockey League (NHL) *181 is the major league in ice hockey. From time to time Totems, Inc. attempted to obtain an NHL franchise for the Seattle Totems. The officers of Totems, Inc. considered an NHL franchise desirable from the standpoint of development of the players and the financial possibilities of the team, particularly after games began to be televised. There is also a measure of prestige associated with being a member of the major league. At the time the Seattle Totems first attempted to become a member of NHL, there were NHL teams located in east coast and midwest cities in the United States and in eastern Canadian cities. By 1972, the number of NHL teams had increased. There were NHL hockey teams located in western cities in the United States and an NHL team, the Canucks, located in Vancouver, British Columbia. The Canucks were owned by a Canadian corporation, Northwest Sports. In April 1972, Northwest Sports obtained ownership of the 55.56 percent of Totems, Inc. stock which was not owned by Dr. Barnes and Mr. Abbey. Northwest Sports from the time it acquired the majority ownership of the stock of Totems, Inc. operated the Seattle Totems as its development team. Joint affiliation agreements *182 between WHL teams and the NHL teams to which the Seattle Totems was a party provided that the signatory clubs recognized that each NHL and WHL team controlled professional hockey within a 50 mile radius of the city in which such teams were located. This resulted in the recognition of territorial rights.Totems, Inc. owned the territorial rights to professional hockey in the Seattle, Washington area. In June of 1974 a conditional franchise in the NHL was awarded to Totems, Inc.Under the NHL rules an organization such as Northwest Sports could own an interest in only one NHL team. In 1972, an agreement (the "White Paper" agreement) had been made between the WHL teams including the Seattle Totems and the NHL whereby the NHL guaranteed certain operating expenses of minor league teams. This agreement also provided that WHL member clubs would be offered the opportunity to purchase at least one-half of the new franchises granted by NHL after the 1974-1975 season. Each WHL team agreed that should it obtain an NHL franchise it would indemnify to a stated extent the remaining minor league teams. Because of the acquisition of over 50 percent of the Totems, Inc. stock by Northwest Sports which *183 owned an NHL team, Totems, Inc. could not rely on the financing provisions of the "White Paper" agreement since this option was given only to WHL teams owned by independent clubs. Although the majority ownership of the stock of Totems, Inc. by an NHL team precluded the Seattle Totems from receiving a subsidy from the NHL, the other aspects of the "White Paper" agreement applied to the Seattle Totems. In anticipation of the possible receipt by the Seattle Totems of an NHL franchise, Mr. Abbey and Dr. Barnes, in May of 1974, agreed that if an NHL franchise was granted for Seattle, they would purchase the Totems, Inc. stock owned by Northwest Sports and would guarantee part of the indebtedness of the Seattle Totems to Northwest Sports. Northwest Sports had advanced or lent to Totems, Inc. substantial sums to pay the operating expenses of the Seattle Totems team. Mr. Abbey and Dr. Barnes decided to have Totems, Inc. purchase its own stock from Northwest Sports with the idea of retiring the stock purchased. In a meeting of the directors of Totems, Inc. held July 26, 1974, a resolution was adopted accepting and ratifying the purchase of stock agreement entered into by Mr. Abbey and Dr. *184 Barnes with Northwest Sports "as treasury stock" and the repayment of funds loaned by Northwest Sports to the Seattle Totems. On September 6, 1974 Peoples National Bank of Washington (Peoples National Bank) made a loan to Totems, Inc., the proceeds of which were used to purchase the stock of Totems, Inc. held by Northwest Sports. In connection with obtaining the loan, Dr. Barnes signed and supplied to the bank an agreement guaranteeing all indebtedness of Totems, Inc. to Peoples National Bank. Based to a large extent upon this guarantee by Dr. Barnes, as well as the co-signing of the note evidencing the loan to Totems, Inc. by Mr. Abbey and a Mr. Arwine, Peoples National Bank lent $146,429 to Totems, Inc. to be used to purchase the Totems, Inc. stock owned by Northwest Sports. The note of Totems, Inc. to Peoples National Bank was dated September 6, 1974, and was co-signed by Mr. Abbey and Mr. Robert M. Arwine individually as guarantors of the corporate loan. The separate document guaranteeing all indebtedness of Totems, Inc. to Peoples National Bank signed by Dr. Barnes operated as a guarantee of the $146,429 loan. On September 6, 1974, Mr. Abbey forwarded a check of Totems, *185 Inc. in the amount of $146,429 to Northwest Sports for the purchase of the Totems, Inc. stock owned by Northwest Sports. The amount of $10,000 of the $146,429 loan made to Totems, Inc. by Peoples National Bank was guaranteed by three automobiles owned by Totems, Inc. The September 6, 1974, note representing indebtedness of Totems, Inc. to Peoples National Bank was due on November 5, 1974. The amount of $10,000 of the Totems, Inc. loan evidenced by the September 6, 1974, note was paid prior to November 5, 1974. On November 5, 1974, a note to Peoples National Bank in the amount of $136,429 was signed by Mr. Abbey, Mr. Arwine, and Dr. Barnes to replace the unrepaid portion of the September 6, 1974, note of Totems, Inc. to Peoples National Bank. This note was due January 6, 1975. On January 6, 1975, the November 5, 1974, note was renewed. The renewed note became due on March 7, 1975, and was again renewed by Mr. Abbey, Mr. Arwine, and Dr. Barnes. The March 7, 1975, note was due on June 9, 1975. On June 9, the note dated March 7, 1975, was renewed with a demand note in the amount of $136,196.79 signed by Mr. Abbey and Dr. Barnes. The purchase by Totems, Inc. of its own shares *186 from Northwest Sports resulted in Mr. Abbey and Dr. Barnes together owning 100 percent of the Totems, Inc. stock. The stock certificates of Totems, Inc. which had previously been owned by Northwest Sports were retained by that corporation as security for the payment of indebtedness of Totems, Inc. to Northwest Sports. In November 1975, Dr. Barnes and Mr. Abbey and Totems, Inc. commenced an antitrust action in the United States District Court for the State of Washington against the NHL and all its member clubs, including Northwest Sports and certain individuals. At the time of the trial of this case, this suit was pending on appeal to the Circuit Court of Appeals for the Ninth Circuit. In 1975 Dr. Barnes paid $68,098.39 of the $136,196.79 note due to Peoples National Bank dated June 9, 1975. The balance of this note was paid by Mr. Abbey. Certain conditions were required to be met in order for Totems, Inc. or the Seattle Totems to receive an NHL franchise. Some of these conditions were spelled out in the tentative franchise agreement. One of the conditions necessary to receiving the NHL franchise was proper financing of the team. Mr. Abbey had discussed means of financing the *187 team with an accountant at Arthur Anderson & Company. In a memorandum dated October 15, 1974, this accountant suggested the possibility of promoting the new NHL franchise for the Seattle Totems through a limited partnership. Mr. Abbey considered this possibility and even had a draft of a limited partnership agreement prepared. However, no formal documents involving either a general or limited partnership to obtain an NHL franchise for the Seattle Totems were signed by Mr. Abbey or Dr. Barnes or anyone else. No certificate of limited partnership was ever filed with the State of Washington or the State of California. Petitioners on their 1975 income tax return claimed a partnership loss of $68,098.39 with the explanation "Vincent H. D. Abbey--E. W. Barnes." Respondent in his notice of deficiency determined that the $68,098.39 claimed as a partnership loss was not a partnership loss but a nonbusiness bad debt deductible to the extent allowed under section 166(d), giving the following explanation: The partnership loss of $68,098 claimed on your 1975 return resulting from the payment to the bank of loans guaranteed by you and your brother-in-law, Vincent Abbey, is reclassified as *188 a nonbusiness bad debt and therefore deductible under Section 166(d) of the Internal Revenue Code as a short-term capital loss. In their petition, petitioners alleged as an alternative that if the Court finds that a Barnes-Abbey general partnership did not exist, petitioners sustained an individual loss of $68,098 in the year 1975 in a transaction entered into for profit since they were attempting to obtain a controlling stock interest in Totems, Inc., a necessary step in obtaining an NFL franchise for the Seattle Totems. OPINION Section 165[2] provides for deduction by a taxpayer of losses sustained during the taxable year. Insofar as here pertinent subsection (c) of section 165 limits the deduction of losses by individuals to losses incurred in a trade or business or in a transaction entered into for profit. [3]Section 166(a) provides for a deduction of any debt which becomes totally worthless within the taxable year. However, section 166(d) limits the deduction of nonbusiness bad debts to a short-term capital loss deduction. [4]
*189 In Putnam v. Commissioner,352 U.S. 82 (1956), the Supreme Court applied the 1939 Code predecessor of section 166(d) and addressed facts which were analogous to those in the instant case. In Putnam, a lawyer, Putnam, advanced funds to a corporation which he had formed with two other individuals. Each taxpayer owned one-third of the corporation's stock. Putnam guaranteed the payment of a portion of the corportion's indebtedness and when he was compelled to pay on the note which he had guaranteed, he claimed an ordinary loss deduction. The Supreme Court held that Putnam's discharge of his obligation as a guarantor created a debt by subrogation and pursuant to the predecessor of section 166(d) the debt "is to be understood as meaning that a loss attributable to the worthlessness of a debt shall be regarded as a bad debt loss, deductible as such or not at all." Putnam,352 U.S. at 88. The Court refused to attribute to Putnam, who was a shareholder of the corporation, the business character of the corporation and treated the loss as a nonbusiness bad debt deductible as a short-term capital loss. In Abbey v. Commissioner,T.C. Memo. 1981-673, *190 we held that the payment by Mr. Abbey of his portion of the note which originated with a loan to Totems, Inc. was deductible only as a nonbusiness bad debt. In that case we considered the fact that Totems, Inc. was not a party to the renewal notes to be immaterial since the result was the same whether we viewed the transaction as a loan from Peoples National Bank to Totems, Inc. guaranteed by the stockholders or as a loan of the stockholders directly to Totems, Inc. Although petitioners argue to the contrary we conclude, based on the facts established in this record, that this case is not distinguishable from Abbey.
Petitioners argue that Dr. Barnes' payment differs from Mr. Abbey's payment in that Dr. Barnes did not endorse the original Totems, Inc. note. However, the record is clear that Dr. Barnes guaranteed the original Totems, Inc. loan. In our view there is no distinction in an endorsement on the note itself or a guarantee of a loan by a separate agreement. In Horne v. Commissioner,523 F.2d 1363, 1365 (9th Cir. 1975), affg. 59 T.C. 319 (1972), the Court held that the language of section 166(d) covers any loss sustained by a third party *191 in connection with an indebtness whether that party is acting as a surety, guarantor, or indemnitor. See also United States v. Hoffman,423 F.2d 1217, 1218 (9th Cir. 1970). The distinction petitioners make between this case and the Abbey case based on the fact that Dr. Barnes did not endorse the initial note of Totems, Inc. but rather guaranteed it by a separate document is immaterial. Petitioners in this case contend, as did the taxpayers in the Abbey case, that Dr. Barnes and Mr. Abbey were partners in a partnership which was attempting to bring an NHL hockey team to Seattle. Petitioners recognize that in the Abbey case we rejected this contention but argue that there is evidence of a partnership in this case which was not present in the Abbey case. The evidence to which petitioners refer is the considerations which were given to the formation of a limited partnership to finance the NHL Seattle Totems Hockey Team if the NHL franchise was granted to Seattle. The first reference to formation of such a limited partnership was subsequent to the time the loan of $146,429 was made to Totems, Inc. No such partnership was ever formed. There is no *192 reliable evidence in this record of any general partnership ever existing between Mr. Abbey and Dr. Barnes. Rather, Mr. Abbey and Dr. Barnes were stockholders in a corporation which owned the WHL franchise for the Seattle Totems and which was attempting to acquire an NHL franchise. The record is not clear as to how Mr. Abbey and Dr. Barnes planned arranging for any limited partnership which might have been formed to take over the Seattle Totems NHL franchise from Totems, Inc. if such a franchise was in fact obtained.The record, however, is clear that no partnership was ever formed, that the WHL franchise for the Seattle Totems was held by Totems, Inc., and that no NHL franchise was actually obtained for the Seattle Totems. Regardless of the intentions of Mr. Abbey and Dr. Barnes regarding financing an NHL franchise for the Seattle Totems through a limited partnership, if an NHL franchise had been obtained, this record is completely clear that there was no limited partnership ever formed for the purpose of acquiring an NHL franchise for the Seattle Totems and that no general partnership existed between Mr. Abbey and Dr. Barnes with respect to either the WHL or the proposed NHL franchise *193 for the Seattle Totems. The WHL franchise was held by the corporation Totems, Inc. and the conditional NHL franchise was to be granted to Totems, Inc. This franchise never materialized since Totems, Inc. was unable to meet the conditions placed on its receipt by the NHL. The record in this case does not reflect the amount of time and energy expended by Dr. Barnes in connection with the affairs of Totems, Inc. He was a stockholder and from time to time was an officer of the corporation. However the fact that Dr. Barnes may have devoted some time and energy to the affairs of Totems, Inc. does not cause the corporation to be his trade or business. See Whipple v. Commissioner,373 U.S. 193, 202 (1963). The debt which was ultimately paid by Mr. Abbey and Dr. Barnes originated with a loan to Totems, Inc. The funds from that loan were expended by Totems, Inc. to acquire its own stock held by Northwest Sports with the intention of retiring that stock. On this record there is no distinction between this case, Putnam v. Commissioner,supra, or Abbey which we decided on substantially the same facts as are present here. In the instant case petitioner *194 incurred the $68,098 obligation to the bank in his capacity as one of Totems, Inc.'s shareholders, not in connection with any trade or business in which he was engaged. Thus his payments to discharge his obligation as a guarantor of the loan constitutes a nonbusiness bad debt and is deductible only as a short-term capital loss pursuant to section 166(d). See Estate of Byers v. Commissioner,57 T.C. 568, 574 (1972), affd. per curiam 472 F.2d 590 (6th Cir. 1973); Martin v. Commissioner,52 T.C. 140, 145-146 (1969), affd. per curiam 424 F.2d 1368 (9th Cir. 1970). We hold for respondent on the only issue presented for our decision. Decision will be entered under Rule 155.
Footnotes
1. Vincent H. D. Abbey was the taxpayer in Abbey v. Commissioner,T.C. Memo. 1981-673. The Abbey case involved a claim by Mr. Abbey for a deduction of the $68,098.39 he paid in 1975 in connection with a loan to the Seattle Totems Hockey Club, Inc. The amount of $68,098.39 of an indebtedness was paid by Mr. Abbey and the amount of $68,098.39, was paid by Dr. Barnes. Both parties recognize that the decision in the Abbey case does not estop Dr. Barnes from litigating the issue in this case. Respondent argues here for the same result reached in the Abbey case on the basis of the decision in that case. Petitioners contend that the Abbey case does not control this case since the facts surrounding Dr. Barnes' payment differed from the facts surrounding Mr. Abbey's payment and further contend that facts have been introduced in evidence in this case that were not in evidence in the Abbey↩ case.
2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954 as amended and in effect during the years here in issue. ↩
3. SEC. 165. LOSSES. (a) General Rule.--There shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise. * * * (c) Limitation on Losses of Individuals.--In the case of an individual, the deduction under subsection (a) shall be limited to-- (1) losses incurred in a trade or business; (2) losses incurred in any transaction entered into for profit, though not connected with a trade or business; * * * ↩
4. SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly worthless debts.--There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * * (d) Nonbusiness Debts.-- (1) General rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩