CHARLES R. and A. JEAN IDEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Iden v. Commissioner
Docket No. 3994-69.
United States Tax Court
T.C. Memo 1974-81; 1974 Tax Ct. Memo LEXIS 238; 33 T.C.M. (CCH) 430; T.C.M. (RIA) 74081; April 1, 1974, Filed. *238 In 1963, petitioner, a lawyer, assumed a guaranty (one-half of a $30,000 cognovit note with a balance due of $27,500), on the debt of a corporate client, relieving the prior guarantor, a 50 percent shareholder of the corporation, of his liability thereunder, in exchange for a $100 per month fee from the corporation in addition to petitioner's regular legal fees. Petitioner owned no interest in the corporation at the time the guaranty was assumed. In assuming the guaranty, petitioner also received an assignment of the prior guarantor's 50 percent stockholdings in the corporation as security for the guaranty; petitioner agreed to transfer the stock to the other 50 percent shareholder without consideration upon the ultimate discharge of the corporate debt under guaranty. In 1965, petitioner loaned the corporation $1,775. The corporation was not then a significant source of legal fees for petitioner, and in fact, after a continuing unsuccessful financial history, the corporation was declared bankrupt in 1965. Petitioner incurred losses on both the guaranty and the loan. Held, the loss incurred on the guaranty was not a loss incurred in the acquisition of a stock, but rather was *239 a bad debt loss. Such loss on the guaranty was a business bad debt loss as the guaranty was proximately related to petitioner's trade or business, and his dominant motivation in becoming liable on the client's debt was to augment his legal income. Held, further, the loss on the loan was a non-business bad debt loss, not proximately related to petitioner's trade or business. Jerome J. Joondeph, for the petitioners. J. Edward Friedland, for the respondent. HOYT
MEMORANDUM FINDINGS OF FACT AND OPINION HOYT, Judge: The Commissioner determined a deficiency in petitioners' Federal income taxes in the amount of $6,360.17 for the taxable year 1965. Our first issue for decision is whether a loss incurred by petitioner on payment under a guaranty of a corporate client's debt was a loss incurred in connection with the purchase of stock in the corporation where petitioner received an assignment of stock in the corporation from the prior guarantor and received a monthly fee from the corporation pursuant to such guaranty, or whether such loss was a bad debt loss, and, if a bad debt loss, whether such loss was a business or nonbusiness bad debt loss. A second issue is whether a loss incurred on a subsequent loan to the corporation was a business or nonbusiness bad debt loss. FINDINGS OF FACT Some of the facts have been stipulated, and such stipulated facts and exhibits attached thereto are incorporated herein *241 by this reference. Petitioners Charles R. Iden and A. Jean Iden are husband and wife. Their legal residence at the time of filing their petition herein was Akron, Ohio. Their joint Federal income tax return for the calendar year 1965 was filed with the district director of internal revenue at Cleveland, Ohio. As A. Jean Iden is a party herein solely because she filed a joint income tax return with her husband for the year at issue, Charles R. Iden will hereinafter sometimes be referred to as petitioner. Petitioner was on the cash receipts and disbursements method of accounting during the taxable year 1965. At all times pertinent hereto, petitioner was an attorney at law in the State of Ohio and a partner in a law firm in Akron, Ohio. Petitioner engaged in the general practice of law with emphasis on general corporate matters and labor law. In the latter part of 1962, petitioner was retained to incorporate Strausser-Stadler Motors, Inc., (hereinafter sometimes referred to as the corporation) to operate as an American Motors dealership and also engage in the selling of used automobiles. The incorporators of the corporation were Arthur Stadler (Stadler) and Wendell R. Strausser *242 (Strausser). Stadler was an automobile dealership sales manager who had four years experience prior to the incorporation of Strausser-Stadler Motors, Inc. Strausser was an experienced automobile dealership service manager with 25 years experience prior to the incorporation. Prior to going into their own business, Stadler and Strausser had been employed by O'Neil Ford Sales, Inc., a Ford dealership owned by J. R. Whitfield (Whitfield). In 1962, O'Neil Ford Sales, Inc., was in the process of selling its Ford dealership, and at that time Whitfield offered to help Stadler and Strausser go into the automobile business on their own. On Sepgember 21, 1962, the corporation was formed under the laws of the State of Ohio by Stadler and Strausser. The legal services required for incorporation were performed by petitioner. Strausser and Stadler each contributed $250 in capital and each received 125 shares as half of the stock of the corporation. Additional capital of $30,000 was obtained by the corporation pursuant to a loan from O'Neil Ford Sales, Inc. In return for the $30,000 loan, the corporation gave O'Neil Ford Sales, Inc., a cognovit note for $30,000 and a chattel mortgage *243 on the corporation's machinery, tools and equipment. In addition, Stadler (and his wife) and Strausser (and his wife) each personally guaranteed the payment of one-half of the note. Stadler became president of the corporation and Strausser became treasurer of the corporation. Petitioner became secretary and a member of the board of directors of the corporation and remained so throughout its existence. As indicated, the corporation engaged in the sale and service of new American Motors automobiles and used automobiles in Ravenna, Ohio, with Stadler as sales manager and Strausser as service manager. In or around June of 1963, Strausser decided to sell his one-half interest in the corporation because he did not want the responsibility for the debts and operations of the corporation and because he felt that his health was poor. At the request of Strausser, Stadler attempted to sell Strausser's interest with the help of American Motors by advertising in a national automotive trade newspaper and through word of mouth advertising. Stadler received no response from any of these sources. Both Stadler and Strausser discussed with petitioner their difficulties in obtaining a purchaser *244 for Strausser's stock. Strausser offered to pay petitioner a $5,000 "bonus" if petitioner would purchase Strausser's stock and assume Strausser's place on the guaranty of the $30,000 note. Petitioner did not want to buy the stock because he had never seen a satisfactory arrangement where a nonemployee had stock in a small corporation and because he did not want to assume the guaranty. However, after a few months, during which period Strausser and Stadler both pressed him to do so, petitioner finally agreed that if Strausser would reduce the corporation's obligation under the note by paying $2,500 thereon and if the corporation would pay petitioner a "fee" of $100 per month, in addition to this regular legal fees, which they assured him would be "generous," as long as petitioner remained liable on the guaranty, petitioner would then assume half of the guaranty on the remaining balance. Petitioner also agreed to take an assignment of Strausser's stock as security for petitioner's promise on the guaranty, and to transfer the stock to Stadler without consideration when the note was finally discharged. At this time the corporation was doing good business and "making between $2,500 *245 and $3,000 a month * * *." On June 19, 1963, petitioner entered into an agreement with O'Neil Ford Sales, Inc., and the corporation whereby petitioner was substituted for Strausser and his wife as a one-half guarantor of the $30,000 note, and Strausser and his wife were released from any liability arising from the guaranty. As part of the June 19, 1963 assumption agreement the corporation was to pay $2,500 to O'Neil Ford Sales, Inc., in reduction of the corporation's obligation under the note, and in addition, make payments of $500 a month commencing July 1, 1963, and ending upon full payment of the note. On June 20, 1963, Strausser paid the corporation $2,500 which was used by the corporation to reduce the corporation's debt under the note. Strausser's half interest in the corporation was transferred by Strausser to petitioner pursuant to the above agreements, with the understanding between Stadler and petitioner that the stock would be transferred to Stadler without consideration when the note was paid in full by the corporation. This oral agreement was not reduced to writing because petitioner and Stadler trusted one another. The stock transfer from Strausser to petitioner *246 was reflected in the corporate minutes, without indication of the contemplated subsequent transfer. Subsequent to the above transaction, the corporation made the $100 monthly fee payments to petitioner in July, August and October of 1963. At the time of the above agreements, the corporation was already making payments to petitioner's fee account with the law firm for prior legal services rendered to the corporation. The corporation had incurred expenses of $590 and $20 for legal services rendered by petitioner's law firm during the corporation's taxable years 1962 and 1963, respectively. The $100 fee payments were paid to petitioner's law firm and credited to petitioner's fee account with the firm. Petitioner's law firm received payments of the following amounts, credited to petitioner's fee account, from the corporation during 1963: Date of Entry
Amount January 28, 1963
$ 45.45
February 14, 1963
100.00
March 21, 1963
100.00
May 15, 1963
100.00
June 19, 1963
100.00
July 8, 1963
100.00
August 15, 1963
100.00
October 15, 1963
100.00
Total
$745.45
In 1963, petitioner's law firm received legal fees aggregating $91,490.82 for legal services *247 rendered by petitioner as a practicing attorney. Petitioner took no part in the operation of the corporation's business activities. His only services rendered to the corporation were legal services. Some time prior to May 1965, the corporation unexpectedly lost its floor plan financing arrangements which had enabled it to carry a large inventory at small cost. From this point its operating funds were so short that it could not operate profitably, nor could it pay petitioner's fees. On May 5, 1965, in order to help finance the corporation's used car operations, petitioner had the corporation sell his automobile for him and permitted the corporation to retain the proceeds received from the sale. The sale price was $1,775. Petitioner received a non-interest bearing note from the corporation in the amount of $1,775. The Federal income tax returns of the corporation for the taxable years 1962 to 1965, inclusive, reported the following losses: Year
Amount of Loss 1962
$6,290.74
1963
7,803.92
1964
8,669.23
1965
Return filed indicating a loss, but no figures provided.
The corporation filed a petition for bankruptcy on September 13, 1965, and became *248 bankrupt in 1965. Petitioner (in the case at Bar) did not file a proof of claim in the bankruptcy proceedings. At this time, Whitfield held the cognovit note, originally in the amount of $30,000, and security agreement relevant thereto, as assignee of O'Neil Ford Sales, Inc. The amount due on the note at the date of the filing for bankruptcy was $26,000, and at that time the liabilities of the corporation substantially exceeded its assets. On September 20, 1965, petitioner paid Whitfield, as assignee of O'Neil Ford Sales, Inc., $3,000 and gave him a note for $10,000 dated October 1, 1965, in fulfillment of petitioner's obligations established by the assumption agreement and original guarantee to pay one half of the outstanding balance of the original $30,000 cognovit note. Petitioner later paid the $10,000 note in full but did not make any payments thereon in 1965. The trustee in bankruptcy abandoned certain tools, parts and accessories as burdensome property. Petitioner and Whitfield agreed that if Whitfield realized anything from the sale or other disposition of the tools, petitioner would receive half of the amount so realized. Whitfield realized $700 from the sale *249 of the tools and credited petitioner with $350 therefrom, which petitioner reported as taxable ordinary income. On his tax return for 1965, petitioner reported as deductions the full $13,000 loss incurred on the guaranty of the corporate debt and the $1,775 loss incurred on the loan of the corporation. In his statutory notice of deficiency, the Commissioner determined, among other items, that the amount of the loss incurred in 1965 on the guaranty was $3,000 and that such loss and the loss on the $1,775 loan were deductible only as capital losses. ULTIMATE FINDING OF FACT Petitioner's dominant motivation in guaranteeing the corporate debt of Strausser-Stadler Motors, Inc., was to protect and assure his legal fee income from that client and to obtain an additional monthly legal fee from the corporation for a period of years. OPINION As some of the issues have been conceded, the only issues remaining for our decision are whether the losses incurred by petitioner on the guaranty of the corporate debt and the loan to the corporation are fully deductible or deductible only as capital losses. Petitioner has conceded that the amount of the loss incurred on the guaranty in *250 1965 was $3,000. Petitioner's primary contention with respect to the loss on the guaranty is that such loss should be treated as a business bad debt loss under the provisions of section 166. [1] Respondent's primary contention is that the guaranty should be considered as assumed by petitioner in order for petitioner to acquire the stock of the corporation from Strausser and that the payment on the guaranty actually represented a loss on the stock itself. Therefore, continues respondent, such loss must be considered as a loss on worthless stock and treated as a short-term capital asset loss under the provisions of section 165. We think that the findings of fact dictate the conclusion that petitioner did not guarantee the debt in order to acquire the stock, but rather only received the stock as a collateral assignment securing the petitioner's guaranty of the corporate debt. We thus view petitioner's loss as a loss on the guaranty of a debt and not a loss on the stock itself. *251 Where a taxpayer sustains a loss upon payment on the guaranty of a debt, and the debtor is unable to satisfy the guarantor, there is created, from the inception of his payment as guarantor, a bad debt loss with respect to the debt immediately arising from the debtor to the guarantor. Accordingly, section 166 exclusively applies to this transaction as a bad debt loss. Putnam v. Commissioner, 352 U.S. 82 (1956); Stratmore v. United States, 420 F.2d 461 (C.A. 3, 1970); Estate of Martha M. Byers, 57 T.C. 568 (1972), affd. per curiam 472 F.2d 590 (C.A. 6, 1973); Robert E. Gillespie, 54 T.C. 1025 (1970), affd. by unpublished order (C.A. 9, 1972). [2]
*252 Under section 166, [3] all bad debt losses are deductible. However, nonbusiness bad debt losses are deductible only as short-term capital losses, under the provisions of section 166(d) (1). Nonbusiness bad debts are those other than debts created or acquired in connection with a trade or business of the taxpayer or debts the losses from the worthlessness of which are incurred in the taxpayer's trade or business, as stated in section 166(d) (2). Thus, only losses on debts incurred in the taxpayer's trade or business or losses on debts the loss from the worthlessness of which is incurred in the taxpayer's trade or business are deductible in full as ordinary losses. Not included in the business bad debt category is a loss on a bad debt incurred in a transaction entered into for profit but which does not constitute the taxpayer's trade or business. Whipple v. Commissioner, 373 U.S. 193 (1963). *253 In this respect, petitioner contends that the guaranty loss qualifies as a fully deductible loss on a bad debt incurred in his trade or business; conversely, respondent contends that petitioner suffered a non-business bad debt loss subject to the provisions of section 166(d) requiring short-term capital loss treatment. In order to qualify as a business bad debt, there must be a proximate relationship between the guaranty and the taxpayer's trade or business where the bad debt loss arises from such guaranty. Stratmore v. United States, supra; Niblock v. Commissioner, 417 F.2d 1185 (C.A. 7, 1969), affirming a Memorandum Opinion of this Court; Estate of Martha M. Byers, supra; Robert E. Gillespie, supra; George P. Weddle, 39 T.C. 493 (1962), affirmed 325 F.2d 849 (C.A. 2, 1963). Petitioner does not contend that he is in the money lending business, or, more appropriately, the business of a guarantor. See Whipple v. Commissioner, supra; Gustin v. Commissioner, 412 F.2d 803 (C. *254 A. 6, 1969), affirming a Memorandum Opinion of this Court; United States v. Henderson, 375 F.2d 36 (C.A. 5, 1967), certiorari denied 389 U.S. 953 (1967). Petitioner also does not contend that the guaranty was made by him to retain a position as a salaried employee of the corporation. See Trent v. Commissioner, 291 F.2d 669 (C.A. 2, 1961). Therefore, petitioner must show that the guaranty was proximately related to his trade or business as a lawyer. He urges on brief that the $100 per month fee was a retainer to be paid to him as long as he remained liable on the corporate note in addition to fees for corporate legal work performed, which were to be generous. In satisfying the requisite proximate relationship, petitioner must first establish that a connection did in fact exist between the guaranty and his trade or business as a lawyer, and second that this connection was a proximate one. Estate of Martha M. Byers, supra; Oddee Smith, [4]55 T.C. 260 (1970), vacated and remanded per curiam, [for a redetermination of the *255 proximity of the relationship under Generes ] 457 F.2d 797 (C.A. 5, 1972). In establishing the proximity of the connection, petitioner must show that his dominant, rather than merely a significant, motive in making the guaranty giving rise to the bad debt loss was his trade or business as a lawyer. United States v. Generes, 405 U.S. 93 (1972), reversing and remanding [with direction that judgment be entered for the United States] 427 F.2d 279 (C.A. 5, 1970). As our ultimate finding reflects, we conclude that petitioner has met his burden. Here petitioner did not have an existing investment in the corporation at the time the guaranty was made. Hence, there could be no competing motive of investment protection to dominate over any trade or business motive, such investment protection being a key element in the decision of many of the noted cases. As our findings indicate also, petitioner did not obtain or make an investment in the transaction at issue either, because he was only to hold Strausser's stock as security and turn it over to Stadler when *256 the corporate note had been paid off. We regard it as significant that all of the fees paid by the corporation, including the $100 per month retainer, were received by petitioner's law firm, rather than by petitioner individually, and were treated as were any other legal fees. Petitioner testified, and we have no reason to doubt his veracity, that, in addition to the generation of the $100 per month legal fee, he was motivated to guarantee the corporation's obligation by a desire to maintain the viability of a fee-producing client and his hope that this service would result in more generous fees for future legal work undertaken for the corporation. We find and hold that petitioner's expectation of continued and increasingly remunerative legal work, along with the corporation's agreement to formalize the lawyer-client relationship by payment of a regular fee in the nature of a retainer, constituted petitioner's dominant motivation for undertaking the guaranty. Since all of the foregoing motives are directly and proximately related to petitioner's trade or business of being a lawyer, petitioner has established to our satisfaction that there was the requisite proximate relationship *257 between the guaranty and his trade or business; he has proved a business bad debt loss deduction of $3,000, the amount paid in 1965 on the corporate obligation. We next come to the loss incurred by petitioner in 1965 with respect to the $1,775 loan to the corporation arising from the sale by the corporation of petitioner's automobile and retention by the corporation of the proceeds therefrom, evidenced by the note given to petitioner. Much of the foregoing discussion on the guaranty loss is applicable to this issue. Here, also petitioner contends that the loss was a bad debt loss arising from his trade or business of practicing law. Respondent contends that the loss was a nonbusiness bad debt loss subject to the limitations of section 166(d). We think that petitioner has failed to demonstrate that the loan was made, or that this loss was incurred, in a proximate relationship to his trade or business. Even assuming that the initial connection might exist, [5] the proximity of that connection cannot be sustained under the dominant motivation test. United States v. Generes, supra.
*258 Petitioner's argument that the primary reason for the loan was to preserve a source of legal fees by assisting the corporation with additional capital seems to be an afterthought. The record clearly shows that at the time the loan was consummated, the corporation had lost its floor plan financing which was deemed essential to its continued profitable operations and ability to pay for petitioner's services. Petitioner's own testimony indicates that by 1965 he did not really expect much more from the corporation in the way of legal fees. Given such circumstances, we can hardly subscribe to petitioner's contention that preserving a source of legal fees was the dominant motivation in making the loan. [6]
We cannot help but think that petitioner was aware of his position as guarantor on the corporate debt and that his $1,775 loan to the corporation, while perhaps a futile gesture in light of subsequent developments, was a wishful effort to stave off the possibility of the corporation's financial collapse and petitioner's becoming liable under the guaranty. *259 The record in this case does not support petitioner's contention that the dominant motivation in making the loan to the corporation was petitioner's trade or business of practicing law, United States v. Generes, supra, and, thus, the loan was not proximately related to his trade or business, Whipple v. Commissioner, supra.
Accordingly, petitioner's loss on the $1,775 loan to the corporation was a nonbusiness bad debt loss subject to the provisions of section 166(d). Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended. ↩
2. This is distinguishable from cases holding that where certain payments by a guarantor do not create a debt running from the original debtor to the guarantor (such as a "bad debt" is not created by the guarantor's payment) sec. 166 is inapposite. See the concurring opinion in Bert W. Martin, 52 T.C. 140, 147 (1969), affd. per curiam 424 F.2d 1368 (C.A. 9, 1970); Santa Anita Consolidated, Inc., 50 T.C. 536, 559 (1968); Eugene H. Rietzke, 40 T.C. 443 (1963); J. J. Shea, 36 T.C. 577 (1961), affd. per curiam 327 F.2d 1002 (C.A. 5, 1964). But see Stratmore v. United States, 420 F.2d 461↩ (C.A. 3, 1970). 3. SEC. 166. BAD DEBTS. (a) General Rule - (1) Wholly worthless debts. - There shall be allowed as a deduction any debt which becomes worthless within the taxable year. * * * (d) Nonbusiness Debts. - (1) General rule. - In the case of a taxpayer other than a corporation - (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. (2) Nonbusiness debt defined. - For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than - (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business. * * * ↩
4. On remand, the Oddee Smith case appears at 60 T.C. 316↩ (1973). 5. See Oddee Smith, 55 T.C. 260 (1970), vacated and remanded, per curiam, [for a redetermination of the proximity of the relationship under Generes ] 457 F.2d 797 (C.A. 5, 1972), and Oddee Smith, 60 T.C. 316↩ (1973). 6. Indeed, petitioner's position with respect to the preservation of a source of legal fees as the dominant motive for the loan is even more remote from Frank M. Garlove, T.C. Memo. 1965-201 and Charles W. Steadman, 50 T.C. 369 (1968), affirmed 424 F.2d 1 (C.A. 6, 1970), certiorari denied 400 U.S. 869↩ (1970), than the similar argument regarding the guaranty. Not only was the corporation not a significant source of legal fees prior to the loan, but at the time the loan was made, what source there was had practically evaporated.